Mata v. State 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-96-012-CR

        RICHARD MATA,
                                                                                               Appellant
        v.

        THE STATE OF TEXAS,
                                                                                               Appellee
 

From the 54th District Court
McLennan County, Texas
Trial Court # 94-888-C
                                                                                                    

O P I N I O N
                                                                                                    

          Appellant, Richard Mata, was indicted for the offense of murder. A jury convicted Mata
of the lesser-included offense of voluntary manslaughter and assessed punishment at twenty years'
incarceration in the Institutional Division of the Texas Department of Criminal Justice and a fine
of $10,000. Tex. Penal Code Ann. §§ 12.33, 19.04 (Vernon 1994). In six points of error,
Mata alleges that: (1) the trial court erred by failing to charge the jury on the right of self defense
against multiple assailants; (2) section 8.04 of the Texas Penal Code is unconstitutional; (3) the
trial court erred in not complying with the requirements for juror note-taking; (4) the State
committed error by improperly commenting on Mata's opportunity to formulate his testimony after
listening to the other witnesses; (5) the trial court erred in entering a deadly weapon finding
without providing Mata with proper notice; and (6) the evidence was factually insufficient to
support the jury's rejection of Mata's theory of self defense.
          Mata was indicted for the murder of Rutilio Rivera. Rivera's death occurred after an
altercation between Mata and Rivera and two of Rivera's friends, Raymond Salazar and Julio
Lazoya. On June 13, 1993, Rivera, Salazar, and Lazoya went to the home of Daisey and Eva
Diaz for the purpose of retrieving an audio tape that Rivera had loaned to Daisey and Eva's
brother, Leno Diaz. Mata was visiting his girlfriend, Eva, at this time. At some point during
Rivera and Leno's conversation, Mata went outside, taking a steak knife as protection. The record
is unclear as to exactly what transpired thereafter. 
          According to the State's witnesses, Mata and Rivera began arguing and Mata stabbed
Rivera. Rivera, Salazar, and Lazoya then grabbed Mata in an attempt to detain and disarm him. 
According to the defense, Rivera, Salazar, and Lazoya attacked Mata, wrestling him to the
ground, where they proceeded to kick and beat him. Mata, in an attempt to free himself, stabbed
at his attackers, wounding Rivera in the melee. In either event, Rivera's death resulted.
          In his first point of error, Mata contends the trial court committed fundamental error when
it failed to charge the jury on the right to defend against multiple assailants. At trial, the court
instructed the jury on self defense; however, the court submitted only the right of Mata to defend
himself against Rivera, the deceased. Neither Salazar nor Lazoya was mentioned in the court's
instructions on Mata's right of self defense. The State concedes that Mata would have been
entitled to an instruction on his right to defend himself against multiple assailants had he so
requested. However, Mata neither objected to the charge as given to the jury nor requested an
instruction on his right to defend against multiple assailants.
          The first inquiry in a review of the charge to the jury is whether the alleged error actually
occurred and if complaint of the error was preserved. If the complaint was preserved at trial, then
any harm, regardless of the degree, is sufficient to require a reversal of a conviction. Hutch v.
State, 922 S.W.2d 166, 170-71 (Tex. Crim. App. 1996); Almanza v. State, 686 S.W.2d 157, 171
(Tex. Crim. App. 1984) (on rehearing). However, if the alleged error is raised for the first time
on appeal, then the appellant must show that the harm resulting from the error was egregious, or
so harmful that the appellant was denied a fair and impartial trial. Hutch, 922 S.W.2d at 171;
Almanza, 686 S.W.2d at 171. 
          A person is justified in using deadly force against another when and to the degree he
reasonably believes the force is immediately necessary to protect himself against the other's use
or attempted use of unlawful deadly force if a reasonable person in the actor's situation would not
have retreated. Tex. Penal Code Ann. §§ 9.31, 9.32 (Vernon 1994 & Supp. 1997); see also
Hamel v. State, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996). Furthermore, the Court of
Criminal Appeals has held that a defendant is entitled to a charge on the right to defend against
multiple assailants if there is evidence, no matter how weak or contradicted, the defendant believed
himself to be in danger of attack from more than one person. Frank v. State, 688 S.W.2d 863,
868 (Tex. Crim. App. 1985). Restricting the charge to the right of self defense against only the
deceased is error if there is evidence that more than one person assailed the defendant. See id.;
Sanders v. State, 632 S.W.2d 346, 347-48 (Tex. Crim. App. [Panel Op.] 1982). 
          Rivera and Salazar had a history of discord with Mata. Mata testified that he had been
"jumped" by Rivera and several of Rivera's friends on at least one prior occasion. He also related
an incident, which occurred at a gas station, where Rivera slammed a car door on his leg. Mata
further testified that when he attempted to return a car to his ex-wife at Salazar's house, Rivera,
Salazar, and another man threw bottles and rocks at him.


 Mata also stated that on several other
occasions during the six months preceding the stabbing Rivera and Salazar chased him. Mata
testified that the tatoos on Salazar's face represented to him that Salazar was a gang leader and that
he had killed someone.
          In regard to the night of the stabbing, Mata testified he became scared when he realized
that Rivera and Salazar were outside the house. He stated that when he saw Salazar exit the
vehicle he became afraid that Salazar and Rivera "were going to jump [him] like they had done
before." He also testified that he could not exit the house except through the front door because
the back door was nailed shut and that he was "terrified."
          Although the trial court did charge the jury on Mata's right of self defense against Rivera,
we find there was some evidence that he believed all three men were about to attack him. Because
there was adequate evidence to support an instruction to the jury regarding Mata's right to defend
himself against multiple assailants, it was error for the trial court to limit its instructions to Mata's
right to defend himself against only the deceased.



          Having found the trial court committed error, we must now turn to the question of whether
such error resulted in egregious harm. Egregious harm is that which alters the very basis of the
defendant's case, deprives the defendant of a valuable right or significantly affects a defensive
theory. Hutch, 922 S.W.2d at 171; Almanza, 686 S.W.2d at 171. To determine if egregious
harm resulted from a jury charge error, we must consider: (1) the charge itself; (2) the state of the
evidence, including contested issues and the weight of the probative evidence; (3) arguments of
counsel; and (4) any other relevant information revealed by the record of the trial as a whole. 
Hutch, 922 S.W.2d at 171; Bailey v. State, 867 S.W.2d 42, 43 (Tex. Crim. App. 1993). The
appellant has the burden of showing that actual, not theoretical, harm occurred and that it was so
utterly erroneous as to deny the appellant a fair and impartial trial. See Alvarado v. State, 912
S.W.2d 199, 216-17 (Tex. Crim. App. 1995) (citing Abdnor v. State, 871 S.W.2d 726, 732 (Tex.
Crim. App. 1994)); Williams v. State, 851 S.W.2d 282, 287 (Tex. Crim. App. 1993). 
          The jury was instructed on both the offense of murder and on the lesser-included offense
of voluntary manslaughter. The jury chose to convict Mata of voluntary manslaughter. In regard
to the instruction on voluntary manslaughter, the charge read:
If you find from the evidence beyond a reasonable doubt that on or about the 13th day of
June, 1993, in McLennan County, Texas, the defendant, Richard Mata, did intentionally
or knowingly cause the death of an individual, Rutilio Rivera by stabbing him, or did then
and there intentionally, with the intent to cause serious bodily injury to Rutilio Rivera,
commit an act clearly dangerous to human life, namely, stab the said Rutilio Rivera which
caused the death of Rutilio Rivera as alleged in the indictment, but you further find from
all the facts and circumstances in evidence in the case, that the defendant, in killing the
deceased, if he did, acted under the immediate influence of a sudden passion arising from
an adequate cause, then you will find the defendant guilty of the lesser offense, voluntary
manslaughter.
The charge defined "sudden passion" as "passion directly caused by and arising out of provocation
by the individual killed or another acting with the person killed, which passion arises at the time
of the offense and is not solely the result of former provocation." (Emphasis added).
          The jury was also charged on the law of self defense. In the general instruction portion
of the charge, the jury was instructed as follows:
You are further instructed that in determining the existence of real or apparent danger, it
is your duty to consider all of the facts and circumstances in evidence in the case before
you and consider the words, acts, and conduct, if any, of Rutilio Rivera at the time of and
prior to the time of the alleged killing, if any, and in considering such circumstances, you
should place yourselves in defendant's position at that time and view them from his
standpoint alone. 

(Emphasis added). 
          During the course of trial, there was evidence presented that Salazar and Lazoya were, at
the very least, in close proximity to Mata at the time of the stabbing. Additionally, during closing
argument, the State discussed not only the presence of Salazar and Lazoya, but also the fact that
both men got out of the vehicle once Mata came out into the yard. Furthermore, Mata's trial
counsel expended much of his allocated time for closing argument on the issue of self defense as
it related to Mata's perception of the situation based on his quarrelsome history with both Rivera's
and Salazar's families and the previous attacks on him by Rivera and Salazar.
          As a reviewing court, we must follow the appellate presumptions that the jury understood
and followed the given instructions. See Hutch, 922 S.W.2d at 172; Richardson v. State, 879
S.W.2d 874, 882 (Tex. Crim. App. 1993). We can find nothing in the record to indicate that the
jury only considered the acts of Rivera without also considering the presence and actions of
Salazar and Lazoya. Consequently, because Mata has failed to demonstrate egregious harm from
the omission of a jury instruction on his right of self defense against multiple assailants, we
overrule Mata's first point of error.
          In his sixth point, Mata contends the evidence is factually insufficient to support the jury's
rejection of his self defense theory. Mata maintains that the proper standard for reviewing a jury's
rejection of a defensive theory is the standard articulated in Clewis v. State, 922 S.W.2d 126, 135
(Tex. Crim. App. 1996). We agree. As we held in Hernandez v. State, the proper standard for
reviewing a jury finding rejecting a defensive theory is whether the evidence presented by both
the State and the defense demonstrates that the conviction is clearly wrong and unjust.


 No. 10-95-325-CR, slip op. at 14 (Tex. App.—Waco January 15, 1997, pet. filed); see also Jones v.
State, No. 72,026, slip op. at 4 (Tex. Crim. App. December 18, 1996); Clewis, 922 S.W.2d at
133, 135; Brumbalow v. State, 933 S.W.2d 298, 300 n.1 (Tex. App.—Waco 1996, pet ref'd). 
Consequently, because it is the State's burden to prove the use of deadly force by the defendant
was not justified, we will review the evidence to determine whether it was sufficient to prove
beyond a reasonable doubt that Mata was not justified in using deadly force against Rivera. See
Tex. Penal Code Ann. §§ 2.03(d), 9.31, 9.32 (Vernon 1994 & Supp. 1997); Saxton v. State,
804 S.W.2d 910, 914 (Tex. Crim. App. 1991).
          The following evidence was adduced at trial:
Raymond Salazar
          Salazar testified to the following facts: On the night of the stabbing, he, Rivera, and
Lazoya had been driving around Waco, drinking beer and listening to music when they drove to
the Diaz house in order to get an audio tape from Leno Diaz. While Rivera and Leno were
talking, Salazar saw Mata step out of the house and then immediately go back inside. After Mata
went back inside the house, Rivera got out of the vehicle and continued his conversation with Leno
until Mata came outside a second time. At that point, Mata and Rivera began arguing, and Salazar
and Lazoya exited the vehicle. During the argument, Mata hit Rivera in the chest


 and then
quickly spun around and slashed Salazar on the finger, leaving a scar which was still visible two
years after the wound. According to Salazar, neither he nor Rivera was armed and he did not hear
Rivera make any threats to Mata.
          On cross-examination, Salazar testified that, when he and Lazoya exited the vehicle, Mata,
Rivera, Lazoya, and himself were all in "a little circle." 
Daisey Diaz
           On direct examination, Daisey Diaz testified that, on the night of the stabbing, Mata went
outside for a brief period and then re-entered the house where he proceeded to arm himself with
a steak knife and then go back outside. She testified that no one called Mata outside. She stated
that ten minutes after Mata exited the house her brother, Leno, came into the house and told her
and Eva that Rivera had been stabbed. When Daisey went outside all she saw was Rivera,
Salazar, and Lazoya on top of Mata, who was on the ground. Daisey further testified that when
Mata returned to the Diaz house much later that night he had a cut on his thumb that, according
to him, he had gotten when he stabbed Rivera.
          On cross-examination, Daisey testified that when Mata first arrived at the Diaz home she
did not see any cuts, bruises, scrapes, or places where hair had been pulled out. She also testified
that, after Mata realized who arrived in the vehicle, his manner became agitated.
Julio Lazoya
          Lazoya testified that on the night Rivera was stabbed that, he, Rivera, and Salazar had been
driving around Waco for several hours, drinking beer and listening to music when they went to
the Diaz residence to get an audio tape that previously had been loaned to Leno Diaz. Lazoya
stated that he was not paying very close attention to the events unfolding in the Diaz front yard
until he heard Rivera and Mata begin to argue. When the argument started, he and Salazar got
out of the vehicle because they believed a fight was imminent. According to Lazoya, Mata was
the one who escalated the confrontation from a verbal disagreement to a physical fray when he
punched Rivera in the chest and then turned around to strike at Salazar. Lazoya did not see any
other weapons besides the knife used to stab Rivera or hear any threats made to Mata.
Dr. Nizam Peerwani
          Dr. Nizam Peerwani, the medical examiner who performed the autopsy on Rivera, testified
that the wound resulting in Rivera's death was consistent with someone holding a knife with an
overhanded grip. Dr. Peerwani also stated that a person who is stabbed in the manner Rivera was
stabbed would not die instantaneously; that he would be capable of continuing to function for a
short period of time. After viewing pictures of Mata's injuries which were admitted into evidence,
Dr. Peerwani further testified that the injuries sustained by Mata were merely superficial and were
not consistent with any injuries caused by violent kicking and hitting.
Eva Diaz
          Eva Diaz was called as a witness for the defense. On direct examination she testified that
Mata was her boyfriend and that, prior to dating Mata, she had dated Rivera. Regarding the night
Rivera was stabbed, Eva testified that Mata had not wanted to go outside but that her brother,
Leno, had called him outside. Eva further stated that Mata did not have any type of weapon when
he went outside. She testified that when she looked outside, she saw three men surrounding Mata
but that she did not see the fight begin because she went to check on her baby. She stated that
when she again looked outside, she saw three men beating up Mata.
          On cross-examination, Eva stated that when she first looked outside, she saw all the men
on the ground and that Mata was being beaten by the other three. She further testified that her
sister, Daisey, had lied about Mata's taking a knife outside to confront Salazar and Rivera because
Daisey did not like Mata.
Richard Mata
          Testifying on his own behalf, Mata first related the previous incidents that had occurred
between him, Rivera and Salazar. In regard to the night he stabbed Rivera, Mata testified that he
went outside twice. The first time he merely stepped outside but stepped back inside when he saw
Salazar exiting the vehicle. He stated that, because the front door was the only exit to the house,
he decided to go back outside but took a small knife to protect himself in case Salazar decided to
"jump" him as he had in the past. Mata stated that when he went outside, he saw Salazar walk
around the back of the vehicle, Lazoya walk around the front, and Rivera exit the driver's side and
begin walking toward him, asking Mata if Mata remembered him. According to Mata, Mata told
Rivera that he did not want any trouble and that he started backing toward the house. Mata
testified that, as he backed up, he bumped into Lazoya who pushed him into Rivera. Mata testified
that all three men then attacked him, wrestling him to the ground where they hit, kicked and
stomped him and pulled out clumps of his hair. Mata stated that he was afraid he was going to
be hurt badly and, remembering he had a knife, got it out of his pocket and started swinging it in
an attempt to get away. 
          In conducting a factual-sufficiency review of the evidence, due deference must be given
the jury's assessment of the witnesses' credibility and their resolution of any conflicts in the
evidence. Jones, slip op. at 4-5; Clewis, 922 S.W.2d at 133; Desselles, 934 S.W.2d at 878. 
These are the prerogatives of the jury as a fact-finding body, and we, as a reviewing court, may
not preempt that role unless the verdict is so contrary to the overwhelming weight of the evidence
as to be clearly wrong and unjust. See Jones, slip op. at 4-5; Clewis, 922 S.W.2d at 135;
Hernandez, slip op. at 18.
          Considering all the evidence, both for and against the verdict, we conclude that the
evidence is factually sufficient to support the jury's rejection of Mata's self defense theory. Both
Salazar and Lazoya testified that Mata was the first person to turn the conflict into a physical battle
when he hit Rivera in the chest. Additionally, Salazar, Lazoya, Daisey Diaz, and Mata all
testified that Mata was armed with a knife. Salazar and Lazoya also testified that Salazar and
Rivera were neither armed with any weapon nor made any threats toward Mata. Furthermore, Dr.
Peerwani testified that the stab wound which killed Rivera was consistent with a wound inflicted
by a knife held in an overhanded manner and that Mata's wounds were not the wounds a person
would sustain had he suffered a beating from three men. 
          Upon considering all the evidence, we find that the jury's rejection of Mata's self defense
theory is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust. Jones, slip op. at 4-5; Clewis, 922 S.W.2d at 135; Hernandez, slip op. at 19. Mata's
sixth point is overruled. 
          In his second point, Mata contends that section 8.04(a) of the Texas Penal Code is
unconstitutional. Tex. Penal Code Ann. § 8.04(a) (Vernon 1994). Section 8.04(a) reads:
"Voluntary intoxication does not constitute a defense to the commission of a crime." Id. Mata
maintains that his constitutional right to due process of law was abridged by not allowing the jury
to consider his voluntary intoxication as a defense. Mata relies upon the Montana Supreme Court
case of State v. Egelhoff in support of his position. 900 P.2d 260 (Mont. 1995). However, the
United States Supreme Court reversed the Montana case and decided the issue adversely to Mata's
position. Montana v. Egelhoff, — U.S. —, 116 S.Ct. 2013, 2023 (1996); see also Williams v.
State, No. 72, 128, slip op. at 12 (Tex. Crim. App. December 18, 1996). Mata's second point
of error is overruled.
          In his third point, Mata argues the trial court's failure to follow the admonishments set
forth in Price v. State regarding note-taking by jurors constituted an abuse of discretion as the
requirements of Price are mandatory. 887 S.W.2d 949, 954-55 (Tex. Crim. App. 1994).


 He
further contends that, even though no objection to the jurors' note-taking was lodged at trial, no
objection was required in order to complain on appeal. The Court of Criminal Appeals has
recently decided this issue contrary to Mata's position and held that, in order to preserve a
complaint about jurors' note-taking, a timely objection must be made. Shannon v. State, No. 71,
805, slip op. at 6 (Tex. Crim. App. December 11, 1996); see also Tex. R. App. P. 52(a). 
Consequently, because Mata did not object at any point during the trial to the jurors' note-taking,
Mata has failed to preserve his complaint for our review. His third point is overruled.
          In his fourth point of error, Mata contends the State committed fundamental error when,
during closing argument, the prosecutor improperly commented on Mata's opportunity to fabricate
the events surrounding the stabbing of Rivera after listening to the other witnesses' testimonies. 
Mata admits that no objection was made at trial, but maintains that because the error was
fundamental none was needed. 
          Classifying the right of a defendant not to be subjected to an incurable erroneous jury
argument as a category-three right,


 the Court of Criminal Appeals has recently held that "a
defendant's failure to object to a jury argument. . . forfeits his right to complain about the
argument on appeal." Cockrell v. State, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). 
          During closing argument, the State made the following statement:
He has had over two years to put his story together with his attorneys, and he has had the
opportunity to sit here and hear every witness' testimony before he got up and told his tale.
As he concedes in his brief, Mata made no objection. Because Mata did not object to the alleged
erroneous jury charge, he is foreclosed from asserting his complaint on appeal. Id. Mata's fourth
point is overruled. 
          In his fifth point of error, Mata contends that error occurred when the trial court, pursuant
to an answer by the jury to a special issue at punishment, entered a deadly weapon finding against
him. Specifically, Mata complains that the affirmative finding of a deadly weapon should not have
been entered because the State did not provide notice alleging that a particular instrument was
used to cause death. We agree.
          A defendant is entitled to notice that the State will seek an affirmative finding that a deadly
weapon was used during the commission of the charged crime. Ex parte Brooks, 847 S.W.2d 247,
248 (Tex. Crim. App. 1993); Narron v. State, 835 S.W.2d 642, 643 (Tex. Crim. App. 1992);
Grettenberg v. State, 790 S.W.2d 613, 614 (Tex. Crim. App. 1990); Ex parte Patterson, 740
S.W.2d 766, 775 (Tex. Crim. App. 1987), overruled on other grounds by Ex parte Beck, 769
S.W.2d 525, 528 (Tex. Crim. App. 1989). Whereas an indictment is the logical place for such
notice, the Court of Criminal Appeals has held that notice of the State's intention to seek an
affirmative finding is proper as long as it is in writing. See Luken v. State, 780 S.W.2d 264, 266
(Tex. Crim. App. 1989). 
          Relying on Narron, the State would have us hold that implied notice of the State's intent
to seek a deadly weapon finding constitutes sufficient notice. The State maintains that, because
the indictment alleged Mata killed Rivera by "stabbing" him, Mata was put on notice that the State
was going to seek a deadly weapon finding because Mata would necessarily have used some object
to stab Rivera.


 Not only do we find the State's argument unpersuasive, our reading of Narron
is that the Court of Criminal Appeals intended that for notice to be sufficient it must "specifically
mention[ ] a particular object or substance and its use with respect to death or serious bodily
injury." Narron, 835 S.W.2d at 643. Consequently, we hold that, because the State failed to
specify the particular weapon used to stab Rivera, Mata did not receive sufficient notice. See id.
          Having determined that the trial court erred in entering an affirmative finding of a deadly
weapon against Mata, we must now determine how the error affected the trial court's judgment
and sentencing. Even where a deadly weapon special issue has been improperly submitted to the
jury, a defendant's conviction and punishment will not necessarily be vitiated where the
submission did not have an effect on the determination of guilt or the length of sentencing. 
Patterson, 740 S.W.2d at 778; Hocutt v. State, 927 S.W.2d 201, 204 (Tex. App.—Fort Worth
1996, pet. filed). In this case, as in Hocutt, the deadly weapon special issue could not have
influenced the jury's determination on Mata's guilt because it was not read to the jury until after
the jury had found Mata guilty of voluntary manslaughter. 927 S.W.2d at 204. However, unlike
the court in Hocutt, we do not find that the improperly submitted deadly weapon special issue
adversely affected the sentencing phase of Mata's trial. In Hocutt, the court analogized the
improper deadly weapon special issue to an improper parole instruction and held that evidence in
the record indicating that the jury found the instruction to be troublesome was sufficient to show
that the defendant was harmed by the erroneously submitted issue. Id. at 405. Here, the record
does not reflect that the jury was troubled by the deadly weapon special issue. Consequently, the
judgment of the trial court will be reformed to delete (1) the recitation of the jury's answer to the
improper deadly weapon special issue, and (2) the trial court's affirmative finding made therefrom. 
Mata's fifth point of error is sustained.
          We affirm the trial court's judgment of guilt and reform the sentence, deleting the deadly
weapon finding.
 
                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Chief Justice Davis,
          Justice Cummings, and
          Justice Vance
          (Justice Vance concurring)
Affirmed as reformed
Opinion delivered and filed February 5, 1997
Publish



"98244cv.tarrantregionalwaterdistrict.wrv.3-14-01.wdn.3-21-01/footnoteicon.gif" alt="Footnote" width="16" height="14" border="0">

 In addition, the District says the evidence shows
that the injuries to the land were temporary, not rising to a “taking,” and the measure of damages
is the cost to repair the injuries.



      With reference to whether the established facts support a “taking,” we will follow the long-standing rule that unchallenged findings of fact occupy the same position and are entitled to the
same weight as the verdict of a jury. McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986)
(citing Swanson v. Swanson, 148 Tex. 600, 228 S.W.2d 156 (1950)). Except for the challenge
to the findings of causation, which we have overruled, the District does not challenge the
evidentiary support or accuracy of the trial court’s findings.


 Thus, when we consider the legal
question about whether there was a “taking,” we are bound by the findings of fact that the court
made. See id.
the parties’ contentions
      The District asserts the exact opposite of the court’s legal conclusion: that no taking had
resulted, as a matter of law.


 It argues that, although Appellees purported to forego all of their
tort claims,


 their proof showed only negligence. That proof, it contends, will not support an
inverse condemnation claim. In addition, the District argues that any harm to Appellees’ land was
temporary, not constituting a “taking,” and therefore damages are limited to the costs of repairing
the harm, for example, fixing roads and fences.


 Although it does not challenge the accuracy of
the court’s findings of fact, the District places greatly different significance on them.
      Conceding that they assert no claim for negligence or an intentional tort, Appellees counter-argument is that the first and second elements of their inverse condemnation cause of action are
not in dispute. They say the District intentionally built and subsequently operated the Reservoir
for the public purpose of supplying water to its customers. Thus, they say the sole question is the
third element ‒ whether that construction and operation resulted in a “taking” of their land.
the authorities
      Under Texas law, a "taking, damage, or destruction" for inverse condemnation purposes is
defined as physical appropriation or invasion of property, or unreasonable interference with a
landowner's right to use and enjoy the property. Westgate, Ltd. v. State, 843 S.W.2d 448, 452
(Tex. 1992). “Taking” by flooding is a specific type of inverse condemnation and has been the
subject of several decisions. 
      When the City of Graham sued the Brazos River Authority for an inverse condemnation of
a sewage disposal plant after the Possum Kingdom Dam was constructed, the Texas Supreme
Court asked: D[id] the operation of the dam and the consequent formation of the lake cause the
flooding of respondent's property? Brazos River Authority v. City of Graham, 264 Tex. 167, 354
S.W.2d 99, 106 (1961). Answering in the affirmative, the Court approved a recovery for a
“taking” of the plant. Id. at 106. However, the court also stated that in determining whether a
“taking” has occurred, the type of property being subjected to the flooding must be considered. 
Id. at 130 (on rehearing) (“There obviously is a difference in the frequency of floodings which
effectually destroy the utility of a sewage disposal plant and the frequency which would impair the
usefulness of farming land to the point where such floodings could be regarded as a 'taking' of
property.”). The Court held that while there had been a “taking” of the sewage disposal plant,
a single flooding of the city’s water treatment plant did not result in a “taking” of it. Id. at 106-08. The Court also noted: “the safer rule to follow is one requiring the plaintiff in actions such
as this to establish definitely by evidence above the dignity of conjecture that the damage claimed
is the result of a repeated and recurring injury rather than a sporadic one. Until a plaintiff is in
position so to establish the repetitious nature of the injury, he should be confined in his demand
for damages to those flowing directly from the single injury or flooding.” Id. at 108.
      A “taking” occurs when the “inundation after erection of the flood-control structures was
greater in extent than it previously had been.” Ansley v. Tarrant County Water Control & Imp.
Dist. No. 1, 498 S.W.2d 469, 475 (Tex. Civ. App.—Tyler 1973, writ ref’d n.r.e.). In Ansley,
as here, the land in question was not adjacent to the reservoir, but was located some distance
away. In fact, it did not border the river, the Trinity River, into which the district was diverting
water. The jury found that “The Ansley property or portions thereof has become subjected to
repeated increased flooding as a result of the construction, maintenance and operation of the Cedar
Creek reservoir, dam, and spillway and discharge channel.” Id. at 471. However, the jury failed
to find any diminution in its market value. Id. In affirming the take-nothing judgment, the Tyler
Court noted that the finding of repeated, increased flooding gave no indication of the size of the
area flooded or the frequency of the “repetition.” Moreover, it said, in view of the fact that the
land had always been subject to repeated overflows prior to the construction of the improvements,
it was not clear as to whether the finding meant that the jury found that the flooding occurred more
frequently after the construction of the improvements or whether the finding merely meant that
there was some increased flooding as measured by the magnitude of water thereon. Nevertheless,
the court said the finding was sufficient to constitute a finding that construction of the
improvements amounted to at least some interference with the plaintiffs’ property rights, but
standing alone, would not be sufficient, as a matter of law, to establish their right to recover
damages. See id. at 474. Furthermore, the court said that when the evidence shows that injury
to land was caused by not only the conduct of the defendant but also by another agency (the
Trinity River), an issue is presented about whether the defendant's conduct, in fact, caused a
decrease in the market value of the land. Id. at 475 (“Appellee was liable for the full amount of
damages caused by it, but was not liable for the damages caused by the Trinity River.”). In
summary, the court rejected the argument that, because the jury found that the land or a portion
thereof had been subjected to repeated increased flooding and because the undisputed testimony
showed a decrease in value, Ansley’s property had been damaged as a matter of law. Id. at 476
(“The basic error in this argument is that it assumes that property which had been floodlands from
times immemorial automatically suffers a decrease in market value as a matter of law, if the
conduct of appellee contributed in the slightest degree to additional floodings.”). Thus, it
concluded, “The inquiry in every case is whether the property has, in fact, suffered a decrease in
market value by reason of the alleged unlawful interference.” Id. at 477.
      In Bennett v. Tarrant County Water Control and Imp. Dist. No. One, 894 S.W.2d 441 (Tex.
App.—Fort Worth 1995, writ denied), the Fort Worth Court found no taking by flooding because
the lake overflowed the dam only once during each of two years, resulting in combined flooding
of plaintiffs’ property of little more than twenty days. Id. at 448. The court noted that under
federal law, for a Fifth Amendment taking, the critical element of an inverse condemnation in a
flooding case is that of "inevitable recurring floods." Singleton v. United States, 6 Cl.Ct. 156,
162 (1984). “[F]looding must be intermittent, frequent, and inevitably recurring to constitute a
compensable taking, otherwise it is merely a consequential injury or a tort.” Bennett, 894 S.W.2d
at 449. The federal courts have established that “one, two, or even three floodings by themselves
do not constitute a taking by inverse condemnation.” Id.
      But see Golden Harvest Co., Inc. v. City of Dallas, 942 S.W.2d 682, 684, 689-90 (Tex.
App.—Tyler 1997, writ denied) (the City’s release in three successive Springs of an abnormal
amount of water from the dam at Lake Ray Hubbard, which caused flooding of and extensive
damage to Golden Harvest’s land located downstream from the dam, raised a fact issue about
whether a “taking” had occurred). 
      Based on these cases, we believe that the test for whether there was an inverse condemnation
by the District is: did the District intentionally perform certain acts in the exercise of its lawful
authority to construct and operate the Reservoir for public use which resulted in the “taking” or
damaging of Appellees’ property, and which acts were the proximate cause of the “taking” or
damaging of such property? See State v. Hale, 146 S.W.2d 731, 736 (Tex. 1941). Because a
portion of Appellees’ property flooded prior to construction of the Reservoir, the flooding will be
considered to be a “taking” only if “inundation after erection of the [reservoir] was greater in
extent than it previously had been.” Ansley, 498 S.W.2d at 475. In addition, we are satisfied that
isolated instances of increased flooding do not result in a “taking”; “repeated increased flooding”
is required. See id. at 474.
findings of fact and conclusions of law
      With respect to conditions on the ranch prior to construction, the court found that the Trinity
River has “always flooded the Gragg Ranch.” The court found:
      6.   heavy rains in the Trinity River watershed in 1989, 1990, and 1991 caused heavy
flooding all over the Trinity River watershed and on the Gragg Ranch; and
      7.   the floods on the ranch from 1990-97 correlated almost exactly with heavy rainfall in the
Trinity River basin.
The court further found that as a “direct result of the construction and operation of Richland-Chambers Reservoir”:
      8.   the flooding on the ranch has been far worse than would have occurred under natural
conditions, and the flooding will continue to be far worse in the future;
      9.   the flood waters from the lake have arrived at the ranch quicker and with less warning
than would have occurred under natural conditions, and will continue to do so;
      10. the flood waters have arrived at the ranch with more force and velocity than would have
occurred under natural conditions, and will continue to do so;
      11. the floods have been deeper on the ranch than would have occurred under natural
conditions, and the deeper floods will continue; 
      12. the ranch has been flooded for longer periods of time than would have occurred under
natural conditions, and will continue to be so.
The court further found:
      13. the existence of a straightened channel leading directly from the dam site almost to the
Trinity River results in concentration of the lake discharge waters and decreased travel
time of the waters from the dam site downstream to the ranch, as compared to natural
conditions;
      14. the increased flooding caused by the reservoir’s construction and operation and the
physical damages to the ranch caused thereby are ongoing and permanent;
      15. the increased flooding caused by the reservoir’s construction and operation is neither
accidental nor the result of isolated or non-recurring events, rather, the flooding is
inevitable, will continue permanently, and is the known result of intentional design and
operational decisions that are within the District’s power; 
      16. the additional flooding caused by the construction and operation of Richland-Chambers
Reservoir constitutes an actual physical appropriation or invasion of the ranch and an
unreasonable interference with the landowners’ right to use and enjoy their property; and
      17. the flooding renders the bottomland portion of the ranch virtually useless, greatly
diminishing the value of the ranch.
      Based on these findings, among others, the court concluded that “the construction and
operation of Richland-Chambers Reservoir has resulted in a taking, damaging, and destruction of
[Appellees’] property by [the District] under Article I, section 17 of the Constitution of the State
of Texas.” The court further concluded that there “has been an inverse condemnation of a
permanent and perpetual flowage easement encompassing the right of [the District] to flood,
overflow and inundate the Gragg Ranch by virtue of the construction and operation of the
Richland-Chambers Reservoir.”
review of the court’s legal conclusion
      We note at the outset that the District takes the position that damage to Appellees’ land
resulting from acts concerning the “operation” of the reservoir would, of necessity, be the result
only of negligence for which the District cannot be liable.


 The court made no finding
concerning negligence in the operation of the reservoir. Thus, we construe the court’s findings
that “construction and operation” of the reservoir resulted in certain events to mean “construction
and operation as designed” resulted in those events. Certainly the District intended to operate the
reservoir when it constructed it. Furthermore, the court found the flooding was “the known result
of intentional design and operational decisions that are within Defendant’s power.”



      The court’s findings of fact, by which we are bound, establish that the construction and
operation of the reservoir as designed resulted in repeated, increased flooding of the ranch, both
in degree and frequency. Thus, we are convinced that the court correctly concluded that the
District intentionally performed certain acts in the exercise of its lawful authority to construct and
operate the Reservoir for public use which resulted in the taking or damaging of Appellees’
property, and which acts were the proximate cause of the “taking” or damaging of such property. 
Tex. Const. art. I, § 17; Brazos River Authority, 354 S.W.2d at 108; Hale, 146 S.W.2d at 736;
Biggar, 848 S.W.2d at 294-95; Ansley, 498 S.W.2d at 475. Issue one is overruled.
measure of damages
      Because we uphold the court’s conclusion that there was a “taking,” and not a “temporary
damaging,” the District’s additional point about the measure of damages being cost of repair rather
than reduction in market value is moot. Issue four is overruled.
WERE THE DAMAGES CORRECTLY DETERMINED?
      The District asserts that even if its acts caused an inverse condemnation of Appellees’ land,
there is “no evidence” to support the jury’s damages award. Specifically, it says there is “no
evidence” (a) of the difference in the market value of the land with and without the easement, (b)
separately proving the diminution in value of the bottom lands, i.e., the flooded lands, and (c)
apportioning the damages caused by factors other than the District, e.g., natural rainfall and other
reservoirs.



      Again, when we review whether the evidence is legally sufficient to support a jury finding,
we consider the evidence “in the light most favorable to the party in whose favor the verdict has
been rendered, and every reasonable inference deducible from the evidence is to be indulged in
that party’s favor.” Havner, 953 S.W.2d at 711. We will find the evidence legally insufficient
if: (1) there is a complete absence of evidence for the finding, (2) there is evidence to support the
finding, but rules of law or evidence bar the court from giving any weight to the evidence, (3)
there is no more than a mere scintilla of evidence to support the finding, or (4) the evidence
conclusively establishes the opposite of the finding. Id. (citing Robert W. Calvert, “No Evidence”
and “Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361, 362-63 (1960)). “More than
a scintilla of evidence exists when the evidence supporting the finding, as a whole, ‘rises to a level
that would enable reasonable and fair-minded people to differ in their conclusions.’” Burroughs
Wellcome, 907 S.W.2d at 499. 
legal sufficiency of the evidence of the difference 
in the market value of the land with and without the easement 
      The court instructed the jury to answer only two questions, both on damages: (1) What was
the difference in market value, if any, of the “entire fee simple interest” in the ranch immediately
before and after the inverse condemnation, taking into consideration any uses to which the
Appellees may subject the land after the taking? and (2) What was the difference in market value,
if any, of the leasehold estate immediately before and after the inverse condemnation, taking into
consideration any uses to which the Appellees may subject the land after the taking? The jury
answered $10,214,122 for the fee simple interest and $4,268,547 for the leasehold interest.



      Appellees proved their damages by two certified land appraisers, Randy Tarpley and Jaimie
Wickliffe. Tarpley testified by stipulation that the Gragg Ranch fee (Question one) depreciated
in value from $10,000,000 (“before the lake started releasing water”) to $2,850,000 (“after the
flooding”). He testified “the Schwertner-Priest lease itself, [had] a difference in value, before and
after the flooding of $4 million.” (Question two)


 
      Wickliffe testified for two days in Appellees’ case in chief and also testified in rebuttal to the
District’s case, more than 300 pages of testimony in all. She described in great detail the appraisal
techniques and standards she used and the data she analyzed when determining how to compute
damages, such as sales of other properties in the area, the number of cattle the ranch could
support, and their value. At one point she was asked “. . . in a condemnation case like this, will
you tell the jury whether or not you’re required to appraise the property before the alleged taking,
and its condition before whatever the damaging factor is alleged to be, and in its condition after
the damaging factor, in this case, the construction and operation of the lake,” to which she
responded: “That’s what – exactly what you have to do. You need to look at the property before
in its before condition and analyze it, and then look at the property separately in its after
condition.”


 She also answered “yes” to this question: “In your report, Mrs. Wickliffe, I notice
– in summary, Mrs. Wickliffe, are you of the view that your estimate of the damages suffered by
the Gragg family, and the diminished value of the lease suffered by the Schwertner and Priest
families accurately and conservatively represent the lost values as a result of the existence and the
operation of Richland-Chambers reservoir?”


 A chart of her conclusions was eventually admitted
as Exhibit 136, which showed the loss in value of the ranch to be $10,214,122, the amount found
by the jury in Question one, and the loss in value of the Schwertner/Priest lease to be $4,268,547,
the amount found by the jury in Question two.



      Based on this testimony, we find the evidence to be legally sufficient to support the jury’s
answers to the two questions.
legal sufficiency of the evidence (1) separately proving the diminution in value of
the bottom lands and (2) apportioning the damages caused by factors other than
the district
      The District complains there was no evidence to support nonexistent jury findings. The jury
was not asked about the diminished value of only the bottom lands, or about damages caused by
factors other than the District. We cannot review a sufficiency point about a jury finding which
does not exist. If the District intended to raise an issue about a charge error, i.e., that the trial
court put the measure of damages to the jury erroneously, it has failed to do so. See Tex. R. App.
P. 38.1(e).
      Even if the District had raised charge error on appeal, its complaint about the separate
diminution in value of the bottom lands is unpreserved. The District filed written requests for
questions and instructions to the charge, none of which specifically addressed this complaint.


 
At the charge conference before closing statements, the District orally made objections and
requests to the charge, but again, none specifically addressed this complaint.


 We cannot review
unpreserved complaints. Tex. R. App. P. 33.1.
      As to the complaint about other causes of the damages, the District did file written requests,
and also orally requested at the charge conference, that the jury be instructed “not to include any
amount of money for a difference in value to the [property] unless you find from a preponderance
of the evidence that such difference in value . . . is not due to some cause other than the Richland-Chambers Reservoir, such as damages to the Ranch caused by flooding on the Trinity River that
would otherwise have occurred, the construction of the bridge over the Trinity River by O.L.
Gragg, or the levees/roads constructed on the Gragg Ranch by O.L. Gragg.” These were not
granted.
      A trial court’s failure to submit a requested instruction in the charge is reviewed for abuse of
discretion. See Texas Dept. of Human Services v. E.B., 802 S.W.2d 647, 649 (Tex. 1990); Knoll
v. Neblett, 966 S.W.2d 622, 633 (Tex. App.—Houston [14th Dist.] 1998, no pet.). An abuse of
discretion occurs “when the trial court’s decision is arbitrary, unreasonable, and without reference
to guiding principles.” Mercedes-Benz Credit Corp. v. Rhyne, 925 S.W.2d 664, 666 (Tex. 1996). 
If abuse is found, the judgment will be reversed only if the failure probably caused the rendition
of an improper judgment. Tex. R. App. P. 44.1(a)(1); Macias v. Moreno, 30 S.W.3d 25, 27
(Tex. App.—El Paso 2000, no pet.).
      The jury was charged immediately before the two damages questions with this instruction:
“You are instructed that in answering the following questions, you are to consider only the
differences in value caused by the construction and operation of Richland-Chambers Reservoir.” 
In substance, this fulfilled the District’s request. Therefore, we find no abuse of discretion in
refusing the requested instruction.
      Issue five is overruled.
SHOULD THE ISSUES HAVE BEEN TRIED SEPARATELY?
      Whether there was a “taking” is a question of law for the court to decide. State v. Heal, 917
S.W.2d 6, 9 (Tex. 1994). However, the amount of damages is a question of fact for the jury. 
Harris County v. Felts, 881 S.W.2d 866, 870 (Tex. App.—Houston [14th Dist.] 1994), aff’d, 915
S.W.2d 482, 484 (Tex. 1996). The District complains that the trial court, without a jury, should
have heard the evidence about whether there was a “taking,” and if the court held there was a
“taking,” only then should a jury have heard evidence on and decided damages.


 
      The District presents no authority that in Texas the preferred practice is to separate the issues
in an inverse condemnation trial. The District cites State v. Wood Oil Distributing, Inc., 751
S.W.2d 863, 865 (Tex. 1988), which states “It is incumbent upon the trial court to make [the
taking] determination prior to trial and to control the admission of evidence accordingly.” 
However, in Wood Oil, the trial court excluded evidence of damages for inconvenience due to
circuitry of travel in an impairment-of-access “taking” case. The appeals court reversed, holding
the jury should have heard this evidence. The Supreme Court reversed the appeals court because
those damages are not compensable in an impairment-of-access case. This led to the statement
quoted above. The District cites no other case to support its argument.



      Resolution of the District’s issue is controlled by Tex. R. Civ. P. 174(b), which states:
“Separate Trials. The court in furtherance of convenience or to avoid prejudice may order a
separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate
issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues.” 
[Emphasis added]. There was only one claim ‒ an inverse condemnation. So, the separation
concerns the damages issue versus the “taking” issue. 
      The District alleges it was prejudiced by the non-bifurcated trial in six ways: (1) the District
was confused throughout the trial about whether the judge or the jury would decide the “taking”
question; (2) the District was forced to deny liability to the jury, while at the same time presenting
evidence on the value of the damages; (3) the District was confused about whether Appellees
claimed a “taking” or a “damaging,” i.e., about whether Appellees wanted “taking” damages or
only damages to repair; (4) evidence of easements obtained from other property owners through
settlement was adduced, which evidence was improper and inflamed the jury; (5) Appellees
successfully excluded evidence of injury throughout the Trinity River basin from natural causes,
but argued to the jury that the District offered no evidence that damages occurred to property
upstream from the Reservoir; and (6) most of Appellee’s closing argument to the jury went to
causation, not valuation, “result[ing] in a tainted verdict.”
      The District further contends “because the evidence and issues are discrete,” separate trials
of the “taking” and damages issues would not have been inconvenient. Also, the District argues
that judicial economy was not promoted by the single trial because if, in a separate trial, the judge
had found no “taking,” there would have been no need for the second part of the trial on damages.
      Taking these arguments in reverse order, because the trial court found a “taking,” the effect
of a separate trial on judicial economy is hypothetical, and therefore moot.
      As for whether a separate trial would not have been inconvenient because the “taking” and
damages issues are discrete, the District has the question reversed. In a Rule 174(b) separate trial
of issues, the question is whether the action the court took, i.e., a single trial, was convenient. 
See Womack v. Berry, 291 S.W.2d 677, 683 (Tex. 1956). The convenience of a single trial is one
ground on which separate trials are rejected. Id.; Rule 174(b). The District’s argument that
separate trials would not have been inconvenient does not address whether the single trial was
convenient. Therefore, the District presents no reviewable issue.
      Numbers two, four, five, and six of the allegations of prejudice contend that the jury was
misled by the single trial, for a variety of reasons. We fail to see how any of the complained-about effects of the single trial may have affected the jury’s determination of damages. As noted,
the jury was asked to find: 
      1.   the difference in market value of the entire fee simple interest in the Ranch immediately
before and immediately after the inverse condemnation of the easement, and 
 
      2.   the difference in market value of the Schwertner/Priest Leasehold estate immediately
before and immediately after the inverse condemnation of the easement.

The jury’s answers to these two questions were derived from testimony from two appraisers about
the value of the land before and after the flooding. The District has not shown how the District’s
having to deny liability while at the same time attacking damages, evidence about other easements
upstream, and closing argument by Appellees about causation, may have affected the jury’s
answers to the questions. 
      We find no merit in allegations of prejudice one and three. The claim is the District was
confused about the nature of Appellees’ claims and damages, and the law pertaining thereto. The
lawsuit was filed in 1991, and trial was in 1998. The parties tried the case on Appellees’ Eighth
Amended Original Petition and the District’s Fifth Amended Answer. The record reflects
extensive discovery. If the District was in fact confused about the nature of Appellees’ pleadings
or about the law applicable thereto, it cannot fault the single trial for that confusion. 
      Finally, it made sense for the issues not to be separated. The two questions presented to the
jury were preceded by this instruction: “You are instructed that in answering the following
questions, you are to consider only the differences in value caused by the construction and
operation of Richland-Chambers Reservoir.” [Emphasis added]. The evidence about causation
applied both to the “taking” issue and to the damages issues. The trial court could not have
known at the beginning of trial what the evidence would be at the end of the trial, or how much
of it the jury should hear to answer whatever questions were to be presented. The trial court
exercised its discretion in avoiding the possibility of needless repetition of the evidence, which
would have required many extra days.


 A trial court’s decision not to separate issues is reviewed
for abuse of discretion. Womack, 291 S.W.2d at 683. There is no duty to order a separate trial
unless “all of the facts and circumstances of the case unquestionably require a separate trial to
prevent manifest injustice, and there is no fact or circumstance supporting or tending to support
a contrary conclusion [i.e., not to separate], and the legal rights of the parties will not be
prejudiced” by a separate trial. Id. The record does not support a conclusion that the trial court
abused its discretion.
      Issue three is overruled.
CONCLUSION
      Having overruled all the District’s issues, we affirm the judgment.
 
                                                                               BILL VANCE
                                                                               Justice

Before Chief Justice Davis,
      Justice Vance, and
      Justice Gray
Affirmed
Opinion delivered and filed March 14, 2001
Publish