Maude L. ANSLEY et al., Appellants,

v.

TARRANT COUNTY WATER CONTROL AND IMPROVEMENT DISTRICT NO. ONE, Appellee.

No. 649.

Court of Civil Appeals of Texas, Tyler.

June 28, 1973.

Rehearing Denied July 26, 1973.

Ivan Irwin, Jr., Shank, Irwin, Conant, Williamson & Grevelle, Dallas, for appellants.

William Brown, Brown, Herman, Scott, Dean & Miles, Fort Worth, for appellee.

MOORE, Justice.

Appellants, Maude L. Ansley, Wesco Materials Corporation, and Bruce Smith, instituted this suit against appellee, Tarrant County Water Control and Improvement District No. One, to recover permanent damages to land alleged to have been caused by the repeated flooding thereof by a dam and spillway constructed by appellee. Appellant Maude Ansley is the surface owner of the 820-acre tract alleged to have been damaged. Appellant Wesco Materials Corporation is the owner of certain sand and gravel rights in the tract and appellant Bruce Smith is the lessee of the grazing and hunting rights thereon. Appellee is a political subdivision of the State of Texas created under the provisions of Article 7880 et seq., Vernon's Ann.Texas Statutes.

As grounds for a cause of action appellants alleged that the land alleged to have been damaged by flooding is situated in Henderson County and lies between the Trinity River and Cedar Creek; that in 1966 appellee constructed a dam on Cedar Creek and in connection therewith constructed a long drainage channel and spillway so that the overflow from the reservoir would drain into the Trinity River near appellants' land; and that prior to the construction of the dam and spillway the waters of Cedar Creek flowed into the Trinity River approximately twenty-three miles downstream from appellants' property, but that after the construction of the dam and spillway the overflow of Cedar Creek Reservoir was diverted into the Trinity River at a point in close proximity to appellants' property. Appellants alleged that at the point where the water from Cedar Creek was discharged into the Trinity, the channel of the river was inadequate to accommodate such water in addition to the natural overflow of the Trinity River and as a result appellants' land was subjected to recurring flooding. Appellants alleged that the conduct of the appellee amounts to a taking or damaging of their lands for public use without compensation in violation of Section 17, Article I of the Constitution, Vernon's Ann.St., of this State. Appellants' claim for damages is not based on negligence. Appellee denied generally the allegations of the petition and specially alleged that the Ansley land was situated in the floodplain of the Trinity River and had been historically subject to floods from the Trinity River prior to the time of the construction of Cedar Creek dam and spillway; that historically such floods had occurred at least once a year and frequently more often and that the construction of the dam and spillway actually caused no damages to the land because the land had al-

ways been, and always would be, subject to flooding by the Trinity River; that by reason of this condition appellants, in fact, sustained no damages as a result of the construction and operation of the Cedar Creek dam and spillway. In the alternative, appellee alleged that any damage which may have been caused was temporary, sporadic and recurring in nature and did not constitute permanent damage to said land.

Trial was had before a jury. The cause was submitted to the jury by five special issues. In response to Special Issue No. 1, the jury found that "the Ansley property or portions thereof has become subjected to repeated increased flooding as a result of the construction, maintenance and operation of the Cedar Creek reservoir, dam, and spillway and discharge channel." By Special Issue No. 2 the jury was requested to find from a preponderance of the evidence whether "the market value of the Ansley property has been decreased by reason of the construction, maintenance and operation of the Cedar Creek reservoir, dam, spillway and drainage channel." The jury answered this issue: "We do not." Special Issue No. 3 requested a finding of whether or not the decrease in market value was "permanent." The jury did not answer this issue since it was conditionally submitted on an affirmative finding to Special Issue No. 2. In response to Special Issues 4 and 5 the jury found that the market value of the Ansley tract immediately prior to the construction of Cedar Creek reservoir, dam, spillway and discharge channel was $743,155.00 and had the same market value of $743,155.00 immediately after the construction thereof.

Based upon the jury verdict, the trial court rendered a take-nothing judgment against appellants. From such Judgment and Order overruling their Motion for New Trial, appellants perfected this appeal.

Article I, Sec. 17 of the Constitution of the State of Texas provides in part as follows:

"Sec. 17. No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made * * *."

■ Since compensation must be paid when property is taken, destroyed or damaged, the distinction between an appropriation and damage without any appropriation is no longer important on the question of liability to pay compensation. McCammon & Lang Lumber Co. v. Trinity & B. V. Ry. Co., 104 Tex. 8, 133 S.W. 247 (1911). It is therefore immaterial with respect to liability for payment of compensation whether the injury to the land is classified as a complete "taking" or as a "damaging" of the land. Trinity & S. Ry. Co. v. Schofield, 72 Tex. 496, 10 S.W. 575 (1889); Brazos River Authority v. City of Graham, 163 Tex. 167, 354 S.W.2d 99 (Tex.1961).

The record shows Tarrant County Water Control and Improvement District No. One was created for the purpose of supplying water to the City of Fort Worth. The Reservoir was constructed under a permit issued by the State Board of Water Engineers, authorizing the impounding of 678,900 acre feet of water by the construction of a dam on Cedar Creek approximately 1 9/10 miles northeast of Trinidad, Texas. After construction of the dam and spillway, the reservoir reached its full storage capacity on or about December 22, 1967, impounding water to an elevation of 322 feet above sea level; however, appellee first commenced discharging water in the river in 1966. In connection with the operation of the dam and reservoir, the District constructed a spillway outlet channel approximately 250' wide, approximately two miles in length in a southwesterly direction so as to empty into the Trinity River. The spillway constitutes the only method of discharging floodwaters from the reservoir.

The 820-acre Ansley tract of land is located approximately one mile up-river from the confluence of appellee's spillway and the Trinity River. The land in ques-

tion does not border on the Trinity but lies about one mile east thereof, being situated between the river and Cedar Creek. It is mostly woodland and contains no improvements except fences. It is without dispute that the land lies within the floodplain of the Trinity River. The elevation of the land for the most part is below that of the river while in banks, so that it has historically been subjected to flooding when the Trinity River overflowed.

By their first four points of error, appellants seek a reversal of the take-nothing judgment rendered against them because they contend the judgment amounts to a taking or damaging of their property for public purposes without compensation in violation of Article 1, Sec. 17 of the Constitution. Appellants argue that since the jury found that the land, or a portion thereof, was subjected to "repeated increased flooding" by reason of the conduct of appellee, it follows, as a matter of law, that their property was permanently "injured" or "damaged." Therefore, they contend that even though their land had always been subject to flooding, the jury's finding that appellee's improvement caused at least some degree of additional flooding, entitles them to damages, as a matter of law. Consequently, they say that the trial court erred in entering judgment on the verdict and erred in refusing to grant them a new trial.

Since we do not agree with the foregoing proposition or any of the other propositions hereinafter asserted by appellants, we accordingly affirm the judgment of the trial court.

A statement of the evidence will be necessary. Rosswell L. Finlay, a consulting engineer, employed by the firm of Forrest and Cotton, Inc., who was called as an expert witness by appellants, testified that he was employed to determine whether the releases of water from the Cedar Creek Reservoir into the Trinity would cause recurring and increased flooding onto the Ansley land, which would not have otherwise occurred prior to the construction of the same. He testified that in making a study of the situation he assembled the basic flow records of both the Trinity River and Cedar Creek from 1940 to 1965 and established a crest gauge on the Ansley property in order to determine the maximum stage achieved by any one flood; that by the use of historical data accumulated from 1940 to 1965, he prepared hydrographs showing historical flooding of the Ansley property caused by the Trinity and that by the use of the hydrographs and a detailed contour map of the Ansley property he was able to determine the amount of historical flooding caused by the river. He then determined what the flood discharges would have been historically from Cedar Creek had the Cedar Creek Reservoir been in existence from 1940 to 1965 and had the same been at its maximum level of elevation of 322 feet at the time of each flood. He testified that he then placed these computations in a computer and developed a new hydrograph showing the incremental flooding on the Ansley property after appellee's improvements were constructed. According to his interpretation of the hydrograph produced by the computer, the historical flooding from the Trinity River on the Ansley property before construction of the improvements would have amounted to only 65,730-acre days. Had the Cedar Creek Reservoir been in existence during the same twenty-five-year period, the flooding would have been 130,530-acre days. He, therefore, concluded that had appellee's improvements been in existence from 1940 to 1965 and had appellee discharged water into the Trinity at the same rate as they had since 1965, there would have been an increase of the flooding on the Ansley tract by 100% prior to 1965. He testified it could be assumed from this that the incremental flooding on the Ansley tract in the future would also be double what it would have been had Cedar Creek water not been diverted into the Trinity. He testified that the discharge of the water from Cedar Creek caused the level of the river to raise for several miles up-

stream depending on the amount discharged into the river and that this was what caused the river to overflow its banks and the flooding of the Ansley land. He testified that on one occasion in 1969, he observed the river while the spillway was being discharged; that the spillway water had the effect of backing up the flow of the Trinity and causing overflow on the Ansley property even though the Trinity was not out of banks at the time. He admitted his estimate of the additional flooding from 1940 to 1965 was a professional opinion based upon statistics accumulated prior to 1965. He also admitted that none of the calculations were based on any statistics showing the various floodings of the Trinity River after 1965 or after the dam and spillway had been constructed and placed in operation in 1966.

Engineering testimony directly conflicting with that of Mr. Finlay was given by appellee's witness Robert Gooch of the Engineering Firm of Freese, Nichols and Endress of Fort Worth. Mr. Gooch testified that he had made studies to determine the effect on the Ansley tract of the historical conditions of flooding on the Trinity River during the period from 1914 to 1965. He testified that he had prepared a study of the actual conditions of overflow on the Ansley property for the period 1965 to 1970, after the dam and spillway had been placed in operation.

Gooch testified that during the fifty-year period prior to 1965 a riverflow of 13,500 cubic feet per second occurred on an average of every 7.4 months and that at such rate of flow, water is caused to rise to an elevation of 285 feet on the Ansley tract flooding 342 acres of the land. He testified that 15,000 cfs. floods occurred on the average of every nine months resulting in the overflow of 689 acres of the Ansley tract and that flows of 21,000 cfs. occurred historically about every fifteen months inundating 749 acres and that every two years, on the average, a flood of 29,500 cfs. had inundated 771 acres.

Gooch testified that he had studied the flooding of the Maude Ansley property since 1965 as affected by Cedar Creek discharges. He testified there had been eight periods of flood since May 3, 1966, and found that the average additional rise in the elevation of flooding on the Ansley property contributed by the spillway discharges from Cedar Creek during this period was about 3½%, in terms of the depth of flooding.

He estimated that the percentage of increase in acres flooded attributable to Cedar Creek spillway discharges was approximately one-half of 1% during the eight periods of floods since May 3, 1966.

He testified further that he had prepared a study of "acre-days of flooding" for the period 1940 through 1965 to correspond with the study made by Mr. Finlay, but that he calculated that the number of acre-days of flooding of the Ansley property caused by historical Trinity River floods during the twenty-five-year period before appellee constructed its improvements was actually 449,318-acre days rather than 65,730 as testified to by Mr. Finlay.

As we understand the engineering testimony, both engineers testified that any flooding of the Ansley property attributable to appellee's improvements was caused by the fact that the waters discharged from the spillway had the effect of impeding the flow of the river thereby causing the water to "stack up" for some distance up the river causing it to flow over its banks and eventually reach the Ansley property.

Appellant, Bruce Smith, testified that he had observed the river at times when appellee was discharging water from the spillway and observed that when the river was within banks, the discharge seemed to go up-river thereby causing it to overflow on the Ansley land and that the water remained on the land longer than it did before.

All witnesses agree that anytime a flood occurred on the Trinity, both before and after appellee constructed its improvements, the Ansley property always became flooded.

Appellants offered other testimony showing that the Ansley land contained substantial gravel deposits. They testified that based upon the opinion of appellants' expert witness, Finlay, that appellee's improvements were calculated to cause a 100% increased flooding and would cause a substantial decrease in the market value of the land and the gravel deposits. Appellants also introduced testimony showing increased flooding would substantially reduce the market value of the land for grazing purposes. Mrs. Ansley testified that for many years prior to the construction of appellee's improvements she had received $500.00 per year for a grazing and hunting lease and $2,500.00 per year as advance royalty for the gravel rights and that she received the same amounts after the improvements had been constructed, although no gravel had been mined for several years prior to the improvements.

It will not be necessary to delineate the testimony of each expert witness relating to the decrease in market value of the land and gravel deposits. Suffice it to say that their testimony as to the market value "before" and "after" the appellee's improvements shows that they were of the opinion that the land suffered a substantial decrease in market value. Appellee offered no evidence as to market value.

■ Where damages for permanent injury to land is claimed, as here, the amount thereof is determined by the decrease in market value as measured by the difference in market value just prior to the time the improvements were constructed and the market value immediately subsequent to such construction. Trinity & S. Ry. Co. v. Schofield, supra; State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194 (Tex.

Com.App.1936); Carter v. City of Tyler, 454 S.W.2d 771 (Tex.Civ.App., Tyler, 1970, ref., n. r. e.).

■ In Special Issue No. 1, the jury was requested to determine whether appellee's improvements caused injury to appellants' land. While the jury found that appellee's improvements caused "repeated increased" flooding thereof, the finding gives no indication of the size of the area flooded or the frequency of the "repetition." Moreover, in view of the fact that the land had always been subject to repeated overflows prior to the construction of the improvements, it is not clear as to whether the finding means that the jury found that the flooding occurred more frequently after the construction of the improvements or whether the finding merely means that there was some increased flooding as measured by the magnitude of water thereon. Nevertheless, we think the finding is sufficient to constitute a finding that appellee's improvements amounted to at least some interference with appellants' property rights. We do not believe, however, that this finding, standing alone, would be sufficient, as a matter of law, to establish appellants' right to recover damages. Ingram v. County of Nueces, 365 S. W.2d 838 (Tex.Civ.App., San Antonio 1963, n. r. e.).

Under the record before us, the question naturally arises as to whether appellee's improvements caused permanent damage to the land or whether the flooding by the Trinity, regardless and independently of appellee's improvements, caused the land to be permanently damaged.

In Owens v. Navarro County Levee Improvement Dist., 281 S.W. 577 (Tex.Civ. App., Waco, 1926), (115 Tex. 263, 280 S. W. 532, Tex.Com.App.), the Court of Civil Appeals said:

"* * * Appellee is not liable for the damages that would have been occasioned by the floods independent of and

regardless of the construction of the levee in controversy, and, if there were no additional damages occasioned by the construction of the levee, appellant should not recover. S. A. & A. P. Ry. Co. v. Kiersey, 98 Tex. 590, 86 S.W. 744; I. & G. N. Ry. Co. v. Walker (Tex.Civ.App.) 97 S.W. 1081; I. & G. N. Ry. Co. v. Fickey, 59 Tex.Civ.App. 133, 125 S.W. 327.

" * * * The trial court should instruct the jury that, in the event they find plaintiff has suffered damage by reason of the construction of the levee improvements, in determining the amount thereof they can take into consideration such damage only as plaintiff is shown by the evidence to have suffered by reason of such construction, as distinguished from the damage, if any, he would have suffered as a result of the overflow, regardless of, and independent of, the construction of said improvements, * * *. Scott v. Northern Traction Co. (Tex.Civ.App.) 190 S. W. 209; Baker v. Beatty (Tex.Civ.App.) 235 S.W. 971; Fugitt v. Farrell (Tex. Civ.App.) 250 S.W. 1108; G. C. & S. F. Ry. Co. v. Baker (Tex.Civ.App.) 218 S. W. 7; Jenkins v. Pennsylvania Ry. Co., 67 N.J.Law, 331, 51 A. 704, 57 L.R.A. 309; Mark v. Hudson River Bridge Co., 103 N.Y. 28, 8 N.E. 243."

In Nichols on Eminent Domain, 3rd Ed., Vol. 5, sec. 16.105(1), it is stated:

"If the land was previously subject to inundation, and after the construction of a levee was still subject to inundation, it has been held that the owner was not entitled to recover for the damages caused thereby, unless the inundation after erection of the flood-control structures was greater in extent than it previously had been. * * *" (Citing Owens v. Navarro County Levee Improvement Dist., supra; Stone v. Los Angeles County Flood Control Dist. 81 Cal.App.2d 902, 185 P.2d 396.)

In the case of City of Amarillo v. Tutor, 267 S.W. 697 (Tex.Com.App.1924), the court held that compensation for interference with the legal rights of enjoyment of property by the owner thereby is guaranteed by the Constitution, *"if by reason of such interference the property as such is lessened in value."* (Emphasis supplied.)

By Special Issue No. 2, the jury was requested to find whether or not appellee's improvements caused appellants to suffer any damages. It will be noted that the issue does not inquire as to whether the increased flooding, as found by the jury in response to Special Issue No. 1, caused a decrease in the market value of the land. The inquiry here is simply whether appellee's improvement caused any damages to the land. In response thereto, the jury refused to find that appellee's improvements caused a decrease in market value. The issue was submitted without objection. Therefore, appellants had the burden of proving by a preponderance of the evidence that their damages were caused by appellee's improvements. Since the jury answered the issue in the negative, this means that appellants failed to establish their burden of proving that it was appellee's improvements that caused their land to be "lessened in value."

Appellee alleged in its answer that it did not cause the lands of appellants to become overflow lands because such lands have always been and always will be subject to overflow from the Trinity River and therefore appellants have, in fact, sustained no damages as a result of any act or omission of appellee.

Where the evidence shows, as here, that injury to the land was caused by not only the conduct of appellee but also by another agency, an issue is presented upon the question of whether the defendant's conduct, in fact, caused a decrease in the market value thereof. Scott v. Northern Texas Traction Co., 190 S.W. 209 (Tex. Civ.App., Dallas, 1916, n. w. h.); Isbell v.

Lennox, 224 S.W. 524 (Tex.Civ.App., Texarkana, 1920), affirmed 116 Tex. 522, 295 S.W. 920; Owens v. Navarro County Levee Impr. Dis., supra; Walker v. Texas Mexican Ry. Co., 27 S.W.2d 574 (Tex.Civ. App., San Antonio, 1930, dismissed); Benavides v. Gonzalez, 396 S.W.2d 512 (Tex. Civ.App., San Antonio, 1965, n. w. h.); Naylor v. J. N. Eagle, 227 Tex. 1012, 303 S.W.2d 239 (1957).

Appellee was liable for the full amount of damages caused by it, but was not liable for the damages caused by the Trinity River. Powell Salt Water Co. v. Bigham, 69 S.W.2d 788 (Tex.Civ.App., Waco, 1934).

"It many times happens that the damage arising from an actionable injury, chargeable to the defendant is, in the nature of things or from the circumstances of the case, indistinguishable from other damage occurring at the same time, attributable to the acts of an independent tort-feasor or to natural causes. In such cases, since the injured party cannot supply the materials necessary to enable the jury to make an exact computation of the damages in suit, the approved practice is to leave it to the good sense of the jury, as reasonable men, to form from the evidence the best estimate that can be made under the circumstances, as a basis of compensatory damages for the actionable injury." Jenkins v. Pennsylvania R. Co., 67 N.J.Law 331, 51 A. 704; California Orange Co. v. Riverside Portland Cement Co., 50 Cal.App. 522, 195 P. 694 (1920).

■ The jury's negative answer to Special Issue No. 2 amounts to a failure or refusal by the jury to find from a preponderance of the evidence that appellee's improvements caused appellants' land to decrease in market value and means, in law, that appellants failed to discharge their burden of proof. In other words, it means that the jury was not persuaded by a preponderance of the evidence that appellee's improvements caused a decrease in market value. C. & R. Transport, Inc. v. Camp-

bell, 406 S.W.2d 191 (Tex.1966); Smith v. Safeway Stores, Inc., 433 S.W.2d 217 (Tex.Civ.App., Tyler, 1968, ref., n. r. e.).

Applying the foregoing principles to the facts, we cannot agree with appellants' contention that their proof, as a matter of law, shows that appellee's improvements caused a decrease in the market value of appellants' property. Appellants' failure to establish that appellee's conduct caused their property to decrease in value is therefore fatal to their cause of action.

■ But we need not rest our holding on this conclusion alone. Even though Special Issue No. 2 could, in some manner, be considered superfluous, we nevertheless believe appellants' failure to discharge their burden of securing a favorable finding on Special Issue No. 5, establishing a decrease in market value, would prevent a recovery. The jury in response to Issues 4 and 5 found, as a matter of fact, that the market value of appellants' land was the same after the construction of the improvements as it was before. Thus, the jury, in effect, found that there had been no decrease in market value, and in law, this means that appellants sustained no damages.

Appellants, however, urge by their remaining points of error that the jury's findings on Special Issue No. 5, as well as their findings on Special Issue No. 2, is not only contrary to the undisputed testimony of the expert witnesses who testified that the property suffered a depreciation in market value, but also that such findings are contrary to the overwhelming weight and preponderance of the evidence. Appellants argue that since the jury found that the land or a portion thereof had been subjected to repeated increased flooding, and since the undisputed testimony shows a decrease in value, it follows, as a matter of law, that their property had been damaged. They maintain that the Constitution guarantees them something for their injury and the judgment is therefore erroneous. We

do not agree. The basic error in this argument is that it assumes that property which had been floodlands from times immemorial automatically suffers a decrease in market value as a matter of law, if the conduct of appellee contributed in the slightest degree to additional floodings. If this assumption were valid, then in every case of this type, the trial court, in the submission of the damage issues to the jury, would be compelled to instruct the jury that in answering the issues the jury must find the after-value of the affected property to be less than the before-value.

The inquiry in every case is whether the property has, in fact, suffered a decrease in market value by reason of the alleged unlawful interference. The determination of market value is usually a question of fact for the jury. We have found no case and have been cited none which would require the trial court to instruct the jury that in the event they found an interference with the legal rights of the enjoyment of the property, the jury would be compelled to find the market value immediately after the interference was less than it was before.

■ Since substantially all of the testimony tendered as to value was opinion testimony, the character of such testimony is but evidentiary and for that reason is not binding on the trier of the facts. The jury is still bound to decide the issue from all of the evidence upon their own fair judgment. Thompson v. State, 311 S.W.2d 927 (Tex.Civ.App., Waco, 1958, ref., n. r. e.). Opinion testimony does not establish any material fact as a matter of law. Hood v. Texas Indemnity Ins. Company, 146 Tex. 522, 209 S.W.2d 345 (Tex.1948). In McCarthy v. City of Amarillo, 307 S.W.2d 595 (Tex.Civ.App., Austin, 1957), a condemnation case, the court said:

"Opinion evidence, in matters of this kind, is not conclusive. A jury may weigh, consider and accept or reject such opinions or it may form its own opinion from the evidence and by utilizing its own experiences and matters of common knowledge. See Coxson v. Atlantic Life Ins. Co., 142 Tex. 544, 179 S.W.2d 943; Scott v. Liberty Mutual Ins. Co., Tex. Civ.App., Austin, 204 S.W.2d 16, writ ref., N. R. E."

■ It is well settled that upon appeal the appellate courts must consider the evidence and inferences properly to be drawn therefrom in the light most favorable to the party obtaining the verdict, and in considering controverted issues of fact, we must consider only that evidence favorable to the verdict and disregard that which is contrary thereto. Thompson v. State, supra. In view of the fact that the land had always been subject to flooding from the Trinity River, we think the jury was authorized to find there was no difference in the "before" and "after" market value of the land and that under the record the jury was justified in leaving the parties where they found them. Appellants' points 5 through 7 are overruled.

The judgment of the trial court is affirmed.

## ON MOTION FOR REHEARING

Appellants interpret us as stating in our original opinion that in overruling their "insufficient" evidence points Nos. 5 and 6, we considered only that evidence which was favorable to the verdict and disregarded that which was contrary thereto. If the language used be subject to such interpretation, we did not so intend. At any rate, in order to clarify the matter we might add that we have again reviewed the record and after considering and weighing all of the evidence, both that in favor of as well as that against the verdict, we are of the opinion that the jury findings attacked by the appellants are not so against the great weight and preponderance of the evidence so as to be manifestly wrong and unjust.

The motion for rehearing is overruled.