Tarrant Regional Water District v. Billy Harden Gragg, et al.










WITHDRAWN
3/21/2001




IN THE
TENTH COURT OF APPEALS
 

No. 10-98-244-CV

     TARRANT REGIONAL WATER DISTRICT,
                                                                         Appellant
     v.

     BILLY HARDEN GRAGG, ET AL.,
                                                                         Appellees
 

From the 77th District Court
Freestone County, Texas
Trial Court # 91-141-A
                                                                                                                
                                                                                                         
O P I N I O N
                                                                                                                

      The Tarrant Regional Water District (“District”) appeals from a judgment in an inverse
condemnation proceeding. The District completed construction of the Richland Chambers
Reservoir (“Reservoir”) in 1987. The Reservoir filled by 1989, and began operation. Appellees
claim that, due to the presence and operation of the Reservoir, their ranch land was repeatedly
inundated with water to the point of being unuseable for ranching. They sued the District for
inverse condemnation, and obtained a verdict in excess of $10,000,000. On appeal, the District
brings multiple points of error. We will affirm the judgment.
FACTUAL AND PROCEDURAL BACKGROUND
      In 1949, O. L. Gragg purchased a ranch of more than 12,000 acres, partly in Anderson
County and partly in Freestone County, divided by the Trinity River. Seventeen hundred or so
acres are “hill land” which has never been subject to flooding by the river. The remainder is
“bottomland” in the Trinity River flood plain. Appellees are the various owners of interests in
that ranch. They are grouped in two ways by ownership: fee simple owners and leasehold owners.
      In 1987, the District completed the Reservoir, an impoundment of approximately 1.2 million
acre-feet of water. It is about eight river-miles north of the northern boundary of the ranch. It
is one of two reservoirs operated by the District in the Trinity River watershed, the other being
Cedar Creek Reservoir (Cedar Creek), some 35 river-miles upstream from the ranch and about
28 miles upstream from Richland Chambers Reservoir.



      On May 1, 1991, Appellees filed suit against the District,


 claiming the District had, by “its
intentional and lawful actions, imposed unreasonable restrictions on [Appellees’] use or enjoyment
of their land, and interfered with [their] access to their property by virtue of the increased flooding
on [Appellees’] property, which is faster, more voluminous, and longer lasting, . . . .” Appellees
further claimed that the District’s acts “have resulted in a permanent injury to their property
interests and a diminution in value of [their] interests in their real property under Article I Sec.
17 of the Constitution of the State of Texas, ....”


 The fee-simple owners claimed damages of
$7.15 million and the leasehold owners claimed damages in excess of $4.2 million.
      The District’s answer


 asserted that it had caused no damage to Appellees’ land, that the river
had historically flooded the ranch, and that the “temporary and sporadic flooding” resulting from
rain did not cause permanent damage to Appellees’ land and thus, no decrease in its fair market
value.
      The case was tried before a jury in 1998. The court ruled that, as a matter of law, an inverse
condemnation had occurred and established the “date of taking” as March 7, 1990. The court
made fifty-eight findings of fact and twenty-eight conclusions of law.


 Damages were determined
by the jury. Judgment was entered for Appellees,


 and the District was awarded a “permanent and
perpetual flowage easement” over the entire ranch. Obviously, the District appealed.
      The District asserts five issues:
      1.   The evidence pertains only to possible negligent acts and omissions by the District, not
to an intentional “taking,” and therefore there was no inverse condemnation.
      2.   Appellees failed to present “any evidence” that the District caused the flooding.
      3.   The trial court erred in failing to conduct separate trials of the “taking” issue and the
damages issues, which prejudiced the District throughout the trial.
      4.   The injuries to the land were temporary and not a permanent “taking,” and the measure
of damages was cost of repair and not reduced market value.
      5.   The jury’s damage awards cannot be sustained because there is “no evidence”: (a) of the
difference in the market value of the land with and without the easement, (b) separately
proving the value of the bottom lands, i.e., the flooded lands, and (c) apportioning the
damages caused by factors other than the District.
      As we view the District’s issues, numbers one, two, and four address the court’s ruling that
there was a “taking.” Number five attacks the damages findings of the jury. And number three
claims the jury should not have been present at that part of the trial in which evidence of the
“taking” was presented. We will first address issue two, then issues one and four together,
followed by issue five, and finally issue three.
INVERSE CONDEMNATION
      Appellees’ sole claim was that the District had caused an inverse condemnation of their land
by its construction and operation of the Reservoir. The applicable elements and standard of review
for such a claim are well settled.
the district
      The District, as a water control and improvement district, is a political subdivision created
under article XVI, section 59 of the Texas Constitution. Tex. Water Code Ann. § 51.011
(Vernon 2000); Bennett v. Tarrant County Water Control and Improvement District Number One,
894 S.W.2d 441 (Tex. App.—Fort Worth 1995, writ denied). It serves only governmental
functions. Bennett, 894 S.W.2d at 450. One such function of the District is to provide for the
control, storage, preservation, distribution, conservation, and reclamation of water, including
flood water. Tex. Water Code Ann. § 51.121(b)(1), (3) (Vernon 2000). It may also control,
abate, or change any shortage or harmful excess of water. Id. § 51.121(b)(5) (Vernon 2000). The
District is also given authority to acquire easements considered necessary, incident, or helpful to
accomplish its purpose. Id. §§ 51.122, 51.123(b), (c) (Vernon 2000). It is undisputed, however,
that it never acquired an easement right in the ranch that would authorize it to flood the property.
texas constitution
      The shield of sovereign immunity does not preclude recovery under “inverse condemnation.” 
See State v. Biggar, 848 S.W.2d 291, 294-95 (Tex. App.—Austin 1993), aff'd, 873 S.W.2d 11
(Tex. 1994). Article I, section 17 of the Texas Constitution provides in part that no person's
property is to be taken for or applied to public use without adequate compensation being made,
unless by the consent of such person.


 Bennett, 894 S.W.2d at 448; Tex. Const. art. I, § 17. 
An inverse condemnation occurs when property is taken for public use without process or without
proper condemnation proceedings, and the property owner attempts to recover compensation
therefor. Allen v. City of Texas City, 775 S.W.2d 863, 864 (Tex. App.—Houston [1st Dist.]
1989, writ denied). To recover under the theory of inverse condemnation, the property owner
must establish: 1) an intentional act of a governmental entity; 2) accomplished for a public
purpose; 3) that damages or takes property from a private citizen. Domel v. City of Georgetown,
6 S.W.3d 349, 357 (Tex. App.—Austin 1999, no pet.) (citing Steele v. City of Houston, 603
S.W.2d 786, 788-92 (Tex. 1980)).


 
standard of review
      The District and Appellees agree that whether a "taking" has occurred, i.e., whether there was
an inverse condemnation, is a question of law. Id.; see also DuPuy v. City of Waco, 396 S.W.2d
103, 110 (Tex. 1965). Conclusions of law are reviewed de novo as legal questions. See Kirkwood
v. City of Corsicana, 871 S.W.2d 544, 546 (Tex. App.—Waco 1994, no writ). Thus, we will
review the trial court’s determination that an inverse condemnation occurred de novo, that is,
“without deference to the lower court's conclusion.” See State v. Heal, 917 S.W.2d 6, 9 (Tex.
1996).
DID THE DISTRICT CAUSE THE FLOODING?
      Before addressing the District’s issues about whether the evidence proved a “taking” or only
negligence, we review issue two in the District’s brief: “Even if Plaintiffs had a legitimate taking
claim, rather than a negligence claim, they failed to adduce any evidence that the District caused
the flooding on their ranch that gave rise to that claim.” This is an attack on the court’s findings
of causation supporting its ruling that a “taking” had occurred, because without causation, there
is no “taking.” The District asserts that the evidence is legally insufficient to establish that the
District caused the flood conditions on Appellees’ property, and therefore the trial court’s findings
of fact and conclusions of law are incorrect.


 Specifically, the District attacks the reliability of the
opinions of Appellees’ experts offered to prove causation, asserting the opinions were based on
inadequate data and flawed methodology, and also attacks the adequacy of the testimony of
Appellees’ lay witnesses to prove causation. 
      To determine whether the evidence is legally sufficient, we consider the evidence “in the light
most favorable to the party in whose favor the verdict has been rendered, and every reasonable
inference deducible from the evidence is to be indulged in that party’s favor.” We will find the
evidence legally insufficient if: (1) there is a complete absence of evidence for the finding, (2)
there is evidence to support the finding, but rules of law or evidence bar the court from giving any
weight to the evidence, (3) there is no more than a mere scintilla of evidence to support the
finding, or (4) the evidence conclusively establishes the opposite of the finding. Merrell Dow
Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997) (citing Robert W. Calvert, “No
Evidence” and “Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361, 362-63 (1960)). 
“More than a scintilla of evidence exists when the evidence supporting the finding, as a whole,
‘rises to a level that would enable reasonable and fair-minded people to differ in their
conclusions.’” Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995) (quoting
Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994)). 
reliability of the expert testimony
      Relying on Havner, the District argues that the testimony of Appellees’ experts about the
Reservoir causing the flood conditions is legally insufficient because of the inadequate data the
experts used when conducting their analysis, and because the analysis itself was flawed. In
Havner, the Supreme Court stated that the legal sufficiency of expert testimony to support a
finding can be reviewed by examining the reliability of the expert’s data and methodology using
the Robinson factors for the admissibility of that same testimony. Havner, 953 S.W.2d at 713-14;
E. I. DuPont de Nemours & Co. v. Robinson, 923 S.W.2d 549 (Tex. 1995) (adopting the holding
setting forth the standards of the admissibility of expert testimony in Daubert v. Merrell Dow
Pharm., Inc., 509 U.S. 579, 590, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993)). The Robinson
factors for determining the reliability of scientific methodology include, but are not limited to:
      (1) the extent to which the theory has been or can be tested;

      (2) the extent to which the technique relies upon the subjective interpretation of the expert;

      (3) whether the theory has been subjected to peer review and publication;

      (4) the technique’s potential rate of error;
 
(5) whether the underlying theory or technique has been generally accepted as valid by
the relevant scientific community; and
 
(6) the non-judicial uses that have been made of the theory or technique.

Havner, 953 S.W.2d at 714 (citing Robinson, 923 S.W.2d at 557). The Havner court concluded:
If the foundational data underlying opinion testimony are unreliable, an expert will not
be permitted to base an opinion on that data because any opinion drawn from that data
is likewise unreliable. Further, an expert’s testimony is unreliable even when the
underlying data are sound if the expert draws conclusions from that data based on flawed
methodology. A flaw in the expert’s reasoning from the data may render reliance on a
study unreasonable and render the inferences drawn therefrom dubious. Under that
circumstance, the expert’s scientific testimony is unreliable and, legally, no evidence.

Id. at 714.
      Appellees relied on two engineers, Dwayne Stubblefield and Gary Martin Pettit, who are
hydrologists,


 to prove causation. Applying the Robinson factors, the District makes the
following allegations about the unreliability of the experts’ testimony.
1. The experts created a computer modeling technique, the X-FOR program, specifically
for this case, which has never been used or tested otherwise, was not known in the
scientific community, and had no non-judicial use.
 
2. The X-FOR program was not used to study actual flooding at the ranch or actual
reservoir operations. It also did not attempt to follow the route of the water from the
Reservoir to the ranch.
 
3. The data for the X-FOR studies was either hypothetical, or was unreliable according
to the experts’ admissions.
 
4. The X-FOR study was based on the untrue assumption that personnel at the dam
always followed the District’s gate release plan when releasing water.
 
5. The experts rejected other computer models which have been subjected to peer review
and publication.
 
6. The experts did not supply a true rate of error analysis for the X-FOR study.
 
7. The experts failed to rule out other causes of the injuries to the ranch. Citing Mitchell
Energy Corp. v. Bartlett, 958 S.W.2d 430, 448 (Tex. App.—Fort Worth 1997, pet.
denied) (an expert proving causation should analyze and exclude other possible causes). 
These other causes were: record rainfall during the 1990s; water from the Cedar Creek
reservoir; seven other reservoirs in the ranch’s drainage area; eight Corps of Engineers
lakes in the area; increased runoff from the Dallas/Fort Worth Metroplex; and tributaries
flowing into the Trinity River.
      We find two significant flaws in the District’s argument. First, the X-FOR analysis was not
the sole or even primary basis for the hydrologists’ opinions about causation. Stubblefield and
Pettit testified over a three-day period ‒ some 500 pages of testimony ‒ about the causes of the
exacerbated flooding and resultant damage at the ranch. They examined data from the United
States Geological Survey of rainfall and water flow, data from the District’s own records (even
though they criticized its accuracy because this data understated the impact of the Reservoir on the
ranch), findings from the District’s computer models, data from gauges at the dam and on the
river, historical data, and testimony from eyewitnesses on the ground and in the air. The X-FOR
program helped analyze part of this data; actually it only made some mathematical calculations to
use in producing some charts, and did not advance a new scientific model. The hydrologists
compiled and analyzed all this data to examine the pre-Reservoir effects of rain and flow levels,
the effects of the gate releases at the dam during rain on water flow down the river versus water
flow without the releases, worsened flooding conditions before and after the Reservoir, surges of
water post-Reservoir, and the concentrations of water down the river pre- and post-Reservoir. 
These effects and conditions were studied in relation to the presence and operation of the
Reservoir. The hydrologists concluded that the flooding conditions at the ranch were exacerbated
by the Reservoir. The District overemphasizes the importance of the X-FOR analysis in this
conclusion. Even without the X-FOR analysis, the record supports the conclusion.
      Second, the X-FOR program does not fail the Robinson analysis. 
      1.   The hydrologists did not believe traditional computer models, like those used by the
District, could accurately analyze the available data about the flooding. So, they created
a tailor-made model, which in the field of hydrology is an accepted practice. The model
they created used techniques and performed studies in a manner accepted and customary
in the industry. The model merely helped with their calculations but did not advance a
new or novel hydrological theory. 
      2.   The hydrologists did follow the route of the water from the Reservoir to the ranch by
using the computer models employed by the District. 
      3.   The hydrologists used reliable data from numerous sources, as described above.
      4.   Stubblefield did provide an error rate of 10% which was not disputed by the District at
trial. 
      5.   There was no credible evidence that the cause of the flood conditions was anything other
than mother nature or the Reservoir. The hydrologists ruled out mother nature, and
found the reservoir to be the cause.
See generally Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713 (Tex. 1998) (not all
experts, in particular engineers, are susceptible to a rigorous Robinson analysis, and their personal
experience can substitute for at least some of the Robinson factors).
      In conclusion, the court, as the “gatekeeper,” could have determined that the underlying data
as well as the methodology used by the hydrologists were adequate under Robinson for their
testimony to be reliable. See Judge Harvey Brown, Eight Gates for Expert Witnesses, 36 Hous.
L. Rev. 743 (1999).
adequacy of the lay testimony
      The District also complains that lay witnesses cannot establish causation. Appellees presented
numerous lay witnesses familiar with the ranch before and after the Reservoir began operation who
testified about the changes in the flood patterns and the effects on the land. Their testimony, taken
together, was that after the Reservoir began operation, floods came more quickly not leaving
enough time to move the cattle, the floods were more forceful destroying roads and scarring the
land, the floods lasted longer and drained slower, and the floods destroyed the crops used to feed
the cattle. These conditions did not exist before the Reservoir. This testimony was specifically
directed at Appellees’ allegations that flood conditions after the Reservoir were dramatically
altered, thereby injuring the land. Credible lay testimony is relevant to causation. City of Odessa
v. Bell, 787 S.W.2d 525, 529 (Tex. App.—El Paso 1990, no writ).
legal sufficiency 
      We need not decide whether the testimony of the experts alone, or for that matter of the lay
witnesses alone, is legally sufficient to prove causation. Their combined testimony is much more
than a mere scintilla to support the court’s findings of causation. See id. (“the testimony of a
number of witnesses who were familiar with the water flow of Monahans Draw and with
Appellees’ property, as well as the testimony of Appellees’ expert . . . is voluminous and
consistent in the descriptions . . . and was clearly sufficient to support the jury’s finding of cause-in-fact damage to the property.”). Issue two is overruled. We turn to issues one and four.
WAS THERE A “TAKING” OR ONLY A “TEMPORARY DAMAGING”?
      The court ruled as a matter of law that an inverse condemnation had occurred. However, the
District asserts that even if there was sufficient evidence of causation, the evidence proved only
negligence and not the elements of a “taking.”


 In addition, the District says the evidence shows
that the injuries to the land were temporary, not rising to a “taking,” and the measure of damages
is the cost to repair the injuries.



      With reference to whether the established facts support a “taking,” we will follow the long-standing rule that unchallenged findings of fact occupy the same position and are entitled to the
same weight as the verdict of a jury. McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986)
(citing Swanson v. Swanson, 148 Tex. 600, 228 S.W.2d 156 (1950)). Except for the challenge
to the findings of causation, which we have overruled, the District does not challenge the
evidentiary support or accuracy of the trial court’s findings.


 Thus, when we consider the legal
question about whether there was a “taking,” we are bound by the findings of fact that the court
made. See id.
the parties’ contentions
      The District asserts the exact opposite of the court’s legal conclusion: that no taking had
resulted, as a matter of law.


 It argues that, although Appellees purported to forego all of their
tort claims,


 their proof showed only negligence. That proof, it contends, will not support an
inverse condemnation claim. In addition, the District argues that any harm to Appellees’ land was
temporary, not constituting a “taking,” and therefore damages are limited to the costs of repairing
the harm, for example, fixing roads and fences.


 Although it does not challenge the accuracy of
the court’s findings of fact, the District places greatly different significance on them.
      Conceding that they assert no claim for negligence or an intentional tort, Appellees counter-argument is that the first and second elements of their inverse condemnation cause of action are
not in dispute. They say the District intentionally built and subsequently operated the Reservoir
for the public purpose of supplying water to its customers. Thus, they say the sole question is the
third element ‒ whether that construction and operation resulted in a “taking” of their land.
the authorities
      Under Texas law, a "taking, damage, or destruction" for inverse condemnation purposes is
defined as physical appropriation or invasion of property, or unreasonable interference with a
landowner's right to use and enjoy the property. Westgate, Ltd. v. State, 843 S.W.2d 448, 452
(Tex. 1992). “Taking” by flooding is a specific type of inverse condemnation and has been the
subject of several decisions. 
      When the City of Graham sued the Brazos River Authority for an inverse condemnation of
a sewage disposal plant after the Possum Kingdom Dam was constructed, the Texas Supreme
Court asked: D[id] the operation of the dam and the consequent formation of the lake cause the
flooding of respondent's property? Brazos River Authority v. City of Graham, 264 Tex. 167, 354
S.W.2d 99, 106 (1961). Answering in the affirmative, the Court approved a recovery for a
“taking” of the plant. Id. at 106. However, the court also stated that in determining whether a
“taking” has occurred, the type of property being subjected to the flooding must be considered. 
Id. at 130 (on rehearing) (“There obviously is a difference in the frequency of floodings which
effectually destroy the utility of a sewage disposal plant and the frequency which would impair the
usefulness of farming land to the point where such floodings could be regarded as a 'taking' of
property.”). The Court held that while there had been a “taking” of the sewage disposal plant,
a single flooding of the city’s water treatment plant did not result in a “taking” of it. Id. at 106-08. The Court also noted: “the safer rule to follow is one requiring the plaintiff in actions such
as this to establish definitely by evidence above the dignity of conjecture that the damage claimed
is the result of a repeated and recurring injury rather than a sporadic one. Until a plaintiff is in
position so to establish the repetitious nature of the injury, he should be confined in his demand
for damages to those flowing directly from the single injury or flooding.” Id. at 108.
      A “taking” occurs when the “inundation after erection of the flood-control structures was
greater in extent than it previously had been.” Ansley v. Tarrant County Water Control & Imp.
Dist. No. 1, 498 S.W.2d 469, 475 (Tex. Civ. App.—Tyler 1973, writ ref’d n.r.e.). In Ansley,
as here, the land in question was not adjacent to the reservoir, but was located some distance
away. In fact, it did not border the river, the Trinity River, into which the district was diverting
water. The jury found that “The Ansley property or portions thereof has become subjected to
repeated increased flooding as a result of the construction, maintenance and operation of the Cedar
Creek reservoir, dam, and spillway and discharge channel.” Id. at 471. However, the jury failed
to find any diminution in its market value. Id. In affirming the take-nothing judgment, the Tyler
Court noted that the finding of repeated, increased flooding gave no indication of the size of the
area flooded or the frequency of the “repetition.” Moreover, it said, in view of the fact that the
land had always been subject to repeated overflows prior to the construction of the improvements,
it was not clear as to whether the finding meant that the jury found that the flooding occurred more
frequently after the construction of the improvements or whether the finding merely meant that
there was some increased flooding as measured by the magnitude of water thereon. Nevertheless,
the court said the finding was sufficient to constitute a finding that construction of the
improvements amounted to at least some interference with the plaintiffs’ property rights, but
standing alone, would not be sufficient, as a matter of law, to establish their right to recover
damages. See id. at 474. Furthermore, the court said that when the evidence shows that injury
to land was caused by not only the conduct of the defendant but also by another agency (the
Trinity River), an issue is presented about whether the defendant's conduct, in fact, caused a
decrease in the market value of the land. Id. at 475 (“Appellee was liable for the full amount of
damages caused by it, but was not liable for the damages caused by the Trinity River.”). In
summary, the court rejected the argument that, because the jury found that the land or a portion
thereof had been subjected to repeated increased flooding and because the undisputed testimony
showed a decrease in value, Ansley’s property had been damaged as a matter of law. Id. at 476
(“The basic error in this argument is that it assumes that property which had been floodlands from
times immemorial automatically suffers a decrease in market value as a matter of law, if the
conduct of appellee contributed in the slightest degree to additional floodings.”). Thus, it
concluded, “The inquiry in every case is whether the property has, in fact, suffered a decrease in
market value by reason of the alleged unlawful interference.” Id. at 477.
      In Bennett v. Tarrant County Water Control and Imp. Dist. No. One, 894 S.W.2d 441 (Tex.
App.—Fort Worth 1995, writ denied), the Fort Worth Court found no taking by flooding because
the lake overflowed the dam only once during each of two years, resulting in combined flooding
of plaintiffs’ property of little more than twenty days. Id. at 448. The court noted that under
federal law, for a Fifth Amendment taking, the critical element of an inverse condemnation in a
flooding case is that of "inevitable recurring floods." Singleton v. United States, 6 Cl.Ct. 156,
162 (1984). “[F]looding must be intermittent, frequent, and inevitably recurring to constitute a
compensable taking, otherwise it is merely a consequential injury or a tort.” Bennett, 894 S.W.2d
at 449. The federal courts have established that “one, two, or even three floodings by themselves
do not constitute a taking by inverse condemnation.” Id.
      But see Golden Harvest Co., Inc. v. City of Dallas, 942 S.W.2d 682, 684, 689-90 (Tex.
App.—Tyler 1997, writ denied) (the City’s release in three successive Springs of an abnormal
amount of water from the dam at Lake Ray Hubbard, which caused flooding of and extensive
damage to Golden Harvest’s land located downstream from the dam, raised a fact issue about
whether a “taking” had occurred). 
      Based on these cases, we believe that the test for whether there was an inverse condemnation
by the District is: did the District intentionally perform certain acts in the exercise of its lawful
authority to construct and operate the Reservoir for public use which resulted in the “taking” or
damaging of Appellees’ property, and which acts were the proximate cause of the “taking” or
damaging of such property? See State v. Hale, 146 S.W.2d 731, 736 (Tex. 1941). Because a
portion of Appellees’ property flooded prior to construction of the Reservoir, the flooding will be
considered to be a “taking” only if “inundation after erection of the [reservoir] was greater in
extent than it previously had been.” Ansley, 498 S.W.2d at 475. In addition, we are satisfied that
isolated instances of increased flooding do not result in a “taking”; “repeated increased flooding”
is required. See id. at 474.
findings of fact and conclusions of law
      With respect to conditions on the ranch prior to construction, the court found that the Trinity
River has “always flooded the Gragg Ranch.” The court found:
      6.   heavy rains in the Trinity River watershed in 1989, 1990, and 1991 caused heavy
flooding all over the Trinity River watershed and on the Gragg Ranch; and
      7.   the floods on the ranch from 1990-97 correlated almost exactly with heavy rainfall in the
Trinity River basin.
The court further found that as a “direct result of the construction and operation of Richland-Chambers Reservoir”:
      8.   the flooding on the ranch has been far worse than would have occurred under natural
conditions, and the flooding will continue to be far worse in the future;
      9.   the flood waters from the lake have arrived at the ranch quicker and with less warning
than would have occurred under natural conditions, and will continue to do so;
      10. the flood waters have arrived at the ranch with more force and velocity than would have
occurred under natural conditions, and will continue to do so;
      11. the floods have been deeper on the ranch than would have occurred under natural
conditions, and the deeper floods will continue; 
      12. the ranch has been flooded for longer periods of time than would have occurred under
natural conditions, and will continue to be so.
The court further found:
      13. the existence of a straightened channel leading directly from the dam site almost to the
Trinity River results in concentration of the lake discharge waters and decreased travel
time of the waters from the dam site downstream to the ranch, as compared to natural
conditions;
      14. the increased flooding caused by the reservoir’s construction and operation and the
physical damages to the ranch caused thereby are ongoing and permanent;
      15. the increased flooding caused by the reservoir’s construction and operation is neither
accidental nor the result of isolated or non-recurring events, rather, the flooding is
inevitable, will continue permanently, and is the known result of intentional design and
operational decisions that are within the District’s power; 
      16. the additional flooding caused by the construction and operation of Richland-Chambers
Reservoir constitutes an actual physical appropriation or invasion of the ranch and an
unreasonable interference with the landowners’ right to use and enjoy their property; and
      17. the flooding renders the bottomland portion of the ranch virtually useless, greatly
diminishing the value of the ranch.
      Based on these findings, among others, the court concluded that “the construction and
operation of Richland-Chambers Reservoir has resulted in a taking, damaging, and destruction of
[Appellees’] property by [the District] under Article I, section 17 of the Constitution of the State
of Texas.” The court further concluded that there “has been an inverse condemnation of a
permanent and perpetual flowage easement encompassing the right of [the District] to flood,
overflow and inundate the Gragg Ranch by virtue of the construction and operation of the
Richland-Chambers Reservoir.”
review of the court’s legal conclusion
      We note at the outset that the District takes the position that damage to Appellees’ land
resulting from acts concerning the “operation” of the reservoir would, of necessity, be the result
only of negligence for which the District cannot be liable.


 The court made no finding
concerning negligence in the operation of the reservoir. Thus, we construe the court’s findings
that “construction and operation” of the reservoir resulted in certain events to mean “construction
and operation as designed” resulted in those events. Certainly the District intended to operate the
reservoir when it constructed it. Furthermore, the court found the flooding was “the known result
of intentional design and operational decisions that are within Defendant’s power.”



      The court’s findings of fact, by which we are bound, establish that the construction and
operation of the reservoir as designed resulted in repeated, increased flooding of the ranch, both
in degree and frequency. Thus, we are convinced that the court correctly concluded that the
District intentionally performed certain acts in the exercise of its lawful authority to construct and
operate the Reservoir for public use which resulted in the taking or damaging of Appellees’
property, and which acts were the proximate cause of the “taking” or damaging of such property. 
Tex. Const. art. I, § 17; Brazos River Authority, 354 S.W.2d at 108; Hale, 146 S.W.2d at 736;
Biggar, 848 S.W.2d at 294-95; Ansley, 498 S.W.2d at 475. Issue one is overruled.
measure of damages
      Because we uphold the court’s conclusion that there was a “taking,” and not a “temporary
damaging,” the District’s additional point about the measure of damages being cost of repair rather
than reduction in market value is moot. Issue four is overruled.
WERE THE DAMAGES CORRECTLY DETERMINED?
      The District asserts that even if its acts caused an inverse condemnation of Appellees’ land,
there is “no evidence” to support the jury’s damages award. Specifically, it says there is “no
evidence” (a) of the difference in the market value of the land with and without the easement, (b)
separately proving the diminution in value of the bottom lands, i.e., the flooded lands, and (c)
apportioning the damages caused by factors other than the District, e.g., natural rainfall and other
reservoirs.



      Again, when we review whether the evidence is legally sufficient to support a jury finding,
we consider the evidence “in the light most favorable to the party in whose favor the verdict has
been rendered, and every reasonable inference deducible from the evidence is to be indulged in
that party’s favor.” Havner, 953 S.W.2d at 711. We will find the evidence legally insufficient
if: (1) there is a complete absence of evidence for the finding, (2) there is evidence to support the
finding, but rules of law or evidence bar the court from giving any weight to the evidence, (3)
there is no more than a mere scintilla of evidence to support the finding, or (4) the evidence
conclusively establishes the opposite of the finding. Id. (citing Robert W. Calvert, “No Evidence”
and “Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361, 362-63 (1960)). “More than
a scintilla of evidence exists when the evidence supporting the finding, as a whole, ‘rises to a level
that would enable reasonable and fair-minded people to differ in their conclusions.’” Burroughs
Wellcome, 907 S.W.2d at 499. 
legal sufficiency of the evidence of the difference 
in the market value of the land with and without the easement 
      The court instructed the jury to answer only two questions, both on damages: (1) What was
the difference in market value, if any, of the “entire fee simple interest” in the ranch immediately
before and after the inverse condemnation, taking into consideration any uses to which the
Appellees may subject the land after the taking? and (2) What was the difference in market value,
if any, of the leasehold estate immediately before and after the inverse condemnation, taking into
consideration any uses to which the Appellees may subject the land after the taking? The jury
answered $10,214,122 for the fee simple interest and $4,268,547 for the leasehold interest.



      Appellees proved their damages by two certified land appraisers, Randy Tarpley and Jaimie
Wickliffe. Tarpley testified by stipulation that the Gragg Ranch fee (Question one) depreciated
in value from $10,000,000 (“before the lake started releasing water”) to $2,850,000 (“after the
flooding”). He testified “the Schwertner-Priest lease itself, [had] a difference in value, before and
after the flooding of $4 million.” (Question two)


 
      Wickliffe testified for two days in Appellees’ case in chief and also testified in rebuttal to the
District’s case, more than 300 pages of testimony in all. She described in great detail the appraisal
techniques and standards she used and the data she analyzed when determining how to compute
damages, such as sales of other properties in the area, the number of cattle the ranch could
support, and their value. At one point she was asked “. . . in a condemnation case like this, will
you tell the jury whether or not you’re required to appraise the property before the alleged taking,
and its condition before whatever the damaging factor is alleged to be, and in its condition after
the damaging factor, in this case, the construction and operation of the lake,” to which she
responded: “That’s what – exactly what you have to do. You need to look at the property before
in its before condition and analyze it, and then look at the property separately in its after
condition.”


 She also answered “yes” to this question: “In your report, Mrs. Wickliffe, I notice
– in summary, Mrs. Wickliffe, are you of the view that your estimate of the damages suffered by
the Gragg family, and the diminished value of the lease suffered by the Schwertner and Priest
families accurately and conservatively represent the lost values as a result of the existence and the
operation of Richland-Chambers reservoir?”


 A chart of her conclusions was eventually admitted
as Exhibit 136, which showed the loss in value of the ranch to be $10,214,122, the amount found
by the jury in Question one, and the loss in value of the Schwertner/Priest lease to be $4,268,547,
the amount found by the jury in Question two.



      Based on this testimony, we find the evidence to be legally sufficient to support the jury’s
answers to the two questions.
legal sufficiency of the evidence (1) separately proving the diminution in value of
the bottom lands and (2) apportioning the damages caused by factors other than
the district
      The District complains there was no evidence to support nonexistent jury findings. The jury
was not asked about the diminished value of only the bottom lands, or about damages caused by
factors other than the District. We cannot review a sufficiency point about a jury finding which
does not exist. If the District intended to raise an issue about a charge error, i.e., that the trial
court put the measure of damages to the jury erroneously, it has failed to do so. See Tex. R. App.
P. 38.1(e).
      Even if the District had raised charge error on appeal, its complaint about the separate
diminution in value of the bottom lands is unpreserved. The District filed written requests for
questions and instructions to the charge, none of which specifically addressed this complaint.


 
At the charge conference before closing statements, the District orally made objections and
requests to the charge, but again, none specifically addressed this complaint.


 We cannot review
unpreserved complaints. Tex. R. App. P. 33.1.
      As to the complaint about other causes of the damages, the District did file written requests,
and also orally requested at the charge conference, that the jury be instructed “not to include any
amount of money for a difference in value to the [property] unless you find from a preponderance
of the evidence that such difference in value . . . is not due to some cause other than the Richland-Chambers Reservoir, such as damages to the Ranch caused by flooding on the Trinity River that
would otherwise have occurred, the construction of the bridge over the Trinity River by O.L.
Gragg, or the levees/roads constructed on the Gragg Ranch by O.L. Gragg.” These were not
granted.
      A trial court’s failure to submit a requested instruction in the charge is reviewed for abuse of
discretion. See Texas Dept. of Human Services v. E.B., 802 S.W.2d 647, 649 (Tex. 1990); Knoll
v. Neblett, 966 S.W.2d 622, 633 (Tex. App.—Houston [14th Dist.] 1998, no pet.). An abuse of
discretion occurs “when the trial court’s decision is arbitrary, unreasonable, and without reference
to guiding principles.” Mercedes-Benz Credit Corp. v. Rhyne, 925 S.W.2d 664, 666 (Tex. 1996). 
If abuse is found, the judgment will be reversed only if the failure probably caused the rendition
of an improper judgment. Tex. R. App. P. 44.1(a)(1); Macias v. Moreno, 30 S.W.3d 25, 27
(Tex. App.—El Paso 2000, no pet.).
      The jury was charged immediately before the two damages questions with this instruction:
“You are instructed that in answering the following questions, you are to consider only the
differences in value caused by the construction and operation of Richland-Chambers Reservoir.” 
In substance, this fulfilled the District’s request. Therefore, we find no abuse of discretion in
refusing the requested instruction.
      Issue five is overruled.
SHOULD THE ISSUES HAVE BEEN TRIED SEPARATELY?
      Whether there was a “taking” is a question of law for the court to decide. State v. Heal, 917
S.W.2d 6, 9 (Tex. 1994). However, the amount of damages is a question of fact for the jury. 
Harris County v. Felts, 881 S.W.2d 866, 870 (Tex. App.—Houston [14th Dist.] 1994), aff’d, 915
S.W.2d 482, 484 (Tex. 1996). The District complains that the trial court, without a jury, should
have heard the evidence about whether there was a “taking,” and if the court held there was a
“taking,” only then should a jury have heard evidence on and decided damages.


 
      The District presents no authority that in Texas the preferred practice is to separate the issues
in an inverse condemnation trial. The District cites State v. Wood Oil Distributing, Inc., 751
S.W.2d 863, 865 (Tex. 1988), which states “It is incumbent upon the trial court to make [the
taking] determination prior to trial and to control the admission of evidence accordingly.” 
However, in Wood Oil, the trial court excluded evidence of damages for inconvenience due to
circuitry of travel in an impairment-of-access “taking” case. The appeals court reversed, holding
the jury should have heard this evidence. The Supreme Court reversed the appeals court because
those damages are not compensable in an impairment-of-access case. This led to the statement
quoted above. The District cites no other case to support its argument.



      Resolution of the District’s issue is controlled by Tex. R. Civ. P. 174(b), which states:
“Separate Trials. The court in furtherance of convenience or to avoid prejudice may order a
separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate
issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues.” 
[Emphasis added]. There was only one claim ‒ an inverse condemnation. So, the separation
concerns the damages issue versus the “taking” issue. 
      The District alleges it was prejudiced by the non-bifurcated trial in six ways: (1) the District
was confused throughout the trial about whether the judge or the jury would decide the “taking”
question; (2) the District was forced to deny liability to the jury, while at the same time presenting
evidence on the value of the damages; (3) the District was confused about whether Appellees
claimed a “taking” or a “damaging,” i.e., about whether Appellees wanted “taking” damages or
only damages to repair; (4) evidence of easements obtained from other property owners through
settlement was adduced, which evidence was improper and inflamed the jury; (5) Appellees
successfully excluded evidence of injury throughout the Trinity River basin from natural causes,
but argued to the jury that the District offered no evidence that damages occurred to property
upstream from the Reservoir; and (6) most of Appellee’s closing argument to the jury went to
causation, not valuation, “result[ing] in a tainted verdict.”
      The District further contends “because the evidence and issues are discrete,” separate trials
of the “taking” and damages issues would not have been inconvenient. Also, the District argues
that judicial economy was not promoted by the single trial because if, in a separate trial, the judge
had found no “taking,” there would have been no need for the second part of the trial on damages.
      Taking these arguments in reverse order, because the trial court found a “taking,” the effect
of a separate trial on judicial economy is hypothetical, and therefore moot.
      As for whether a separate trial would not have been inconvenient because the “taking” and
damages issues are discrete, the District has the question reversed. In a Rule 174(b) separate trial
of issues, the question is whether the action the court took, i.e., a single trial, was convenient. 
See Womack v. Berry, 291 S.W.2d 677, 683 (Tex. 1956). The convenience of a single trial is one
ground on which separate trials are rejected. Id.; Rule 174(b). The District’s argument that
separate trials would not have been inconvenient does not address whether the single trial was
convenient. Therefore, the District presents no reviewable issue.
      Numbers two, four, five, and six of the allegations of prejudice contend that the jury was
misled by the single trial, for a variety of reasons. We fail to see how any of the complained-about effects of the single trial may have affected the jury’s determination of damages. As noted,
the jury was asked to find: 
      1.   the difference in market value of the entire fee simple interest in the Ranch immediately
before and immediately after the inverse condemnation of the easement, and 
 
      2.   the difference in market value of the Schwertner/Priest Leasehold estate immediately
before and immediately after the inverse condemnation of the easement.

The jury’s answers to these two questions were derived from testimony from two appraisers about
the value of the land before and after the flooding. The District has not shown how the District’s
having to deny liability while at the same time attacking damages, evidence about other easements
upstream, and closing argument by Appellees about causation, may have affected the jury’s
answers to the questions. 
      We find no merit in allegations of prejudice one and three. The claim is the District was
confused about the nature of Appellees’ claims and damages, and the law pertaining thereto. The
lawsuit was filed in 1991, and trial was in 1998. The parties tried the case on Appellees’ Eighth
Amended Original Petition and the District’s Fifth Amended Answer. The record reflects
extensive discovery. If the District was in fact confused about the nature of Appellees’ pleadings
or about the law applicable thereto, it cannot fault the single trial for that confusion. 
      Finally, it made sense for the issues not to be separated. The two questions presented to the
jury were preceded by this instruction: “You are instructed that in answering the following
questions, you are to consider only the differences in value caused by the construction and
operation of Richland-Chambers Reservoir.” [Emphasis added]. The evidence about causation
applied both to the “taking” issue and to the damages issues. The trial court could not have
known at the beginning of trial what the evidence would be at the end of the trial, or how much
of it the jury should hear to answer whatever questions were to be presented. The trial court
exercised its discretion in avoiding the possibility of needless repetition of the evidence, which
would have required many extra days.


 A trial court’s decision not to separate issues is reviewed
for abuse of discretion. Womack, 291 S.W.2d at 683. There is no duty to order a separate trial
unless “all of the facts and circumstances of the case unquestionably require a separate trial to
prevent manifest injustice, and there is no fact or circumstance supporting or tending to support
a contrary conclusion [i.e., not to separate], and the legal rights of the parties will not be
prejudiced” by a separate trial. Id. The record does not support a conclusion that the trial court
abused its discretion.
      Issue three is overruled.
CONCLUSION
      Having overruled all the District’s issues, we affirm the judgment.
 
                                                                               BILL VANCE
                                                                               Justice

Before Chief Justice Davis,
      Justice Vance, and
      Justice Gray
Affirmed
Opinion delivered and filed March 14, 2001
Publish